**IN THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT**

| | |
|---|---|
| Stop the Pipeline, | |
| Petitioner, | No. 26-1437 |
| v. | |
| Federal Energy Regulatory Commission, | |
| Respondent, | |
| Constitution Pipeline Company, LLC and Iroquois Gas Transmission System, L.P., | |
| Movants-Intervenors. | |

**PETITIONER STOP THE PIPELINE'S MEMORANDUM OF LAW
IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS**

# Table of Contents

Table of Authorities ..........................................................................ii

Preliminary Statement.................................................................... 1

Argument

I. THE COMMISSION'S 2026 REMAND ORDER IS THE FINAL AGENCY ACTION OF THE PRIOR PROCEEDINGS ............................................................. 1

    A. The 2026 Remand Order Marks the End of FERC's Decisionmaking Process of the Prior Proceedings ............................................................. 4

    B. Procedural Orders Can Have Substantive Impacts.. 6

II. STOP THE PIPELINE HAS CONSTITUTIONAL AND PRUDENTIAL STANDING .............................................. 13

    A. Stop the Pipeline and Its Members Are Being Injured by the Remand Order ................................... 14

    B. Stop the Pipeline's Injury Is Directly Caused by FERC's Failure to Adhere to the 2022 Mandate in Its Remand Order .................................................... 20

    C. Stop the Pipeline's Injuries Would Be Redressed by a Favorable Judicial Decision ............................. 20

Conclusion ................................................................................... 22

Attachment A (Second Circuit Mandate)

Attachment B (STP Letter to FERC)

Attachment C (Constitution Petition, without attachments)

Attachment D (Constitution Petition, Attachment H)

Attachment E (McKinney Declaration)

Attachment F (Fissel and Konwinski Declaration, with exhibits)

## Table of Authorities

**Cases**

*Atlantic City Electric Company v. FERC*

    329 F.3d 856 (D.C. Cir. 2003) ..................................................... 10

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................. 4, 13

*Fore River Residents Against the Compressor Station v. FERC*,
77 F.4th 882 (D.C. Cir. 2023) ..................................................... 20

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982) ................................................................... 12

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................... 13

*MISO Transmission Owners v. FERC*,
45 F.4th 248 (D.C. Cir. 2022) ..................................................... 10

*Morris v. Sec. & Exch. Comm'n*,
116 F.2d 896 (2d Cir. 1941) ......................................................... 5

*N.C. Utils. Comm'n v. FERC*,
761 Fed.Appx. 9 (D.C. Cir. 2019) ............................................... 14

*Nat'l Envtl. Dev Ass'ns Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ..................................................... 18

*National Labor Relations Board v. Nexstar Media, Inc.*,

    133 F.4th 201 ........................................................................... 4, 6

*PG & E Gas Transmission v. FERC*,
315 F.3d 383 (D.C. Cir. 2003) ..................................................... 13

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ................................................................... 19

*Sullivan v. Hudson*,
490 U.S. 877 (1989) ..................................................................... 9

*Trump v. New York*,
  592 U.S. 125 (2020) ............................................................ 14,15,18

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
  513 U.S. 18 (1994) ............................................................... 13

*Williston Basin Interstate Pipeline Co. v. FERC*,
  475 F.3d 330 (D.C. Cir. 2006) ................................................. 5

**Statutes**

18 C.F.R. § 157.8 .................................................................. 17

18 C.F.R. §§ 157.5 ............................................................ 13,17,19

5 U.S.C. 706 ......................................................................... 10

15 U.S.C. § 717f.......................................................... 10,13,17,18,19

15 U.S.C. § 717r ............................................................. 5,13,14,18

33 U.S.C. § 1341 ............................................................... 10,18,20

U.S. Const. amend. V ........................................................... 13,16,17

## PRELIMINARY STATEMENT

Petitioner Stop the Pipeline ("Petitioner" or "STP") respectfully submits this memorandum in opposition to the Federal Energy Regulatory Commission's ("FERC" or "the Commission") Motion to Dismiss. Despite FERC's claim to the contrary, its 2026 Remand Order is the final agency action of the prior proceedings. In that Order, FERC added additional language, purporting to create a right to continue to rely on vacated orders and dismissed proceedings, and this is STP's only opportunity to challenge that Order. STP has constitutional and prudential standing under the Natural Gas Act ("NGA"), as injuries flow directly from the 2026 Remand Order.

Were this Court to grant Defendant's Motion to Dismiss, Petitioner would be denied the full extent of the legal process leaving it with little to no recourse for the injuries faced by its members. It is for these reasons that STP respectfully requests that this Court deny the Commission's Motion to.

### I. THE COMMISSION'S 2026 REMAND ORDER IS THE FINAL AGENCY ACTION OF THE PRIOR PROCEEDINGS

On November 18, 2021, this Court vacated orders that were under review and instructed the Federal Energy Regulatory Commission to "dismiss the agency proceedings." The Mandate was issued on January 10, 2022. *See* Mandate, *Catskill Mountainkeeper v. FERC,* Case No. 16-345, Doc. No. 484, *N.Y. State*

*Dep't of Envt'l Conservation v. FERC,* Case No. 19-4338, Doc. No. 168 (Jan. 10, 2022) (Att. A) ("2022 Mandate"). Four years later, Stop the Pipeline asked FERC to comply with the Court's order by "immediately dismiss[ing] the agency proceedings as instructed." Matter of Constitution Pipeline, LLC, Dkt. Nos. CP13-499, CP13-502, CP18-5, Jan. 14, 2026, Accession No. 20260115-5008 (Att. B). On January 23, 2026, the Commission issued an order stating that it was dismissing the agency's proceedings. *See* Constitution Pipeline Co., Order on Remand ¶ 1, 194 FERC ¶ 61,064 (2026), Accession No. 20260123-3074 ("2026 Remand Order").

However, the Commission went beyond what the Court instructed it to do. In addition to dismissing the agency proceedings, it also stated "[t]he 2025 Petition is currently pending, and the Commission is not in any way pre-judging the merits of the 2025 Petition in this order." *Id*. P 10. "In any case, nothing in our enabling statutes, our rules, our precedent or the Second Circuit's mandate bars parties from making filings on 'dismissed,' 'terminated,' or 'defunct' dockets. Nor is there any authority preventing the Commission from taking action on such filings." *Id*. P 13.

Stop the Pipeline objects to and has filed a petition to challenge the inclusion of these statements in the 2026 Remand Order because they are contrary to the specific instructions of the 2022 Mandate. *See* Form C-A, Doc. No. 10. By

2

commingling statements about the new dockets in its 2026 Remand Order,[1] FERC is attempting to integrate the new proceedings into its final Order on Remand and thereby alter the meaning of the Court's 2022 Mandate in ways it was not authorized to do. This undermines the equitable relief provided by this Court to Stop the Pipeline when it granted its motions for vacatur, and the loss of that equitable relief has led to new injuries and aggrievement.

Under the NGA, STP had to request rehearing and petition for review of the 2026 Remand Order now or forever lose the right to challenge FERC's final agency action from the prior proceedings. 15 U.S.C. §§ 717r(a), (b); *Williston Basin Interstate Pipeline Co. v. FERC*, 475 F.3d 330, 336 (D.C. Cir. 2006) ("Statutory jurisdictional requirements, such as the provisions of 15 U.S.C. § 717r, are not mere technicalities that can be brushed aside by a court."). When FERC denied the request for rehearing, STP was required to challenge any issues with the 2026 Remand Order within a limited time. The injuries described below, and in Section II, stem directly from that Order, and, accordingly, this Court should deny the Motion to Dismiss.

---

[1] Agency docket numbers CP13-499-006, CP13-502-003, and CP18-5-004, which were opened for the new proceedings, are not listed in the captions on the 2022 Mandate or the 2026 Remand Order.

### A. The 2026 Remand Order Marks the End of FERC's Decisionmaking Process of the Prior Proceedings.

As in *Nexstar*, *Nat'l Lab. Rel. Bd. v. Nexstar Media, Inc.*, 133 F.4th 201 (2d Cir. 2025), the Respondent and Movants-Intervenors characterize the 2026 Remand Order as a nonfinal, interlocutory order. Resp.'s Br. 11-18; Movants-Intervenors Br. at 1-7. However, as the name of the order indicates, it is the final order of the prior proceedings. This "consummation" of the prior proceedings is confirmed by the agency docket numbers in the caption of the 2026 Remand Order, which precisely match the agency docket numbers in the caption of the 2022 Mandate. (*See* Att. A). Since the new docket numbers do not appear in its caption, the 2026 Remand Order cannot be considered an interlocutory order of the new proceedings. Instead, the new dockets are comparable to the discrete issue that was severed in *Nexstar*.

In *Bennett*, the Supreme Court applied a two-prong rule for determining finality. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). This Court recently quoted *Bennett* in a motion to dismiss. *Nexstar,* 133 F.4th at 204. "To be considered 'final,' an agency order must satisfy two criteria: 'First, the action must mark the consummation of the agency's decisionmaking process-it must not be of a merely tentative or interlocutory nature.'" *Id.* "[S]econd, the action must be one by which 'rights or obligations have been determined,' or 'from which legal consequences will flow.'" *Id.*

4

It appears the Commission intentionally included language about the new proceedings in its 2026 Remand Order so that it could claim it is interlocutory and thereby evade judicial review of it. This is consistent with FERC's prior positions. In 2022, this Court instructed FERC "to dismiss the agency proceedings" when it remanded the case after vacating its orders. FERC objected to vacatur in 2021,[2] and then failed to follow the Court's order for four years. It only issued the 2026 Remand Order after Stop the Pipeline specifically asked it to "immediately dismiss the agency proceedings as instructed." (Att. B). STP's request was intentionally limited to the Court's instructions and made no mention of the new proceedings or docket numbers. However, the Commission added two paragraphs to its Order on Remand justifying and authorizing the actions it was taking in the current proceedings. *See* 2026 Remand Order PP 10, 13 (2026), Accession No. 20260123-3074. Stop the Pipeline asked FERC to rescind those paragraphs in its request for rehearing. Request for Rehearing of Stop the Pipeline 1-2, n.4 (Feb. 23, 2026), Accession No. 20260223-5140. The Commission refused and is now trying to dismiss the three petitions by mischaracterizing them as interlocutory. "If the tribunal to which a cause is remanded misconstrues or fails to follow the mandate of the appellate court, the mandate may be enforced by a new appeal or

---

[2] *See* FERC's Reply, Mot. To Dismiss, 3-4, Case No. 16-345, Doc. No. 428 (Feb. 11, 2021); FERC Letter Br., Case No. 19-4338, Doc. No.148, at 2 (May 17, 2021).

by mandamus to enforce a ministerial duty." *Morris v. Sec. & Exch. Comm'n*, 116 F.2d 896, 898 (2d Cir. 1941).

If this Court dismisses the petitions without vacating the offending paragraphs, they become binding precedent. Even though this Court never authorized the Commission to reissue or reaffirm the orders it vacated (based on the application and documents it instructed FERC to dismiss), FERC has attempted to unilaterally acquire that authority by issuing its 2026 Remand Order. While Respondent and Movants-Intervenors claim petitioners will have an opportunity to challenge a future final order, that result is not guaranteed. The new proceedings may end just like the prior proceedings did, with the Movants-Intervenors deciding not to proceed with the project.[3] If the petitions for review are dismissed, FERC will have created an unorthodox method for reviving vacated orders. Since this is the only opportunity Petitioners have to challenge the 2026 Remand Order, the first prong is satisfied. "The order at issue here is final." *Nexstar*, 133 F.4th at 204.

**B.      Procedural Orders Can Have Substantive Impacts.**

In 2021, Stop the Pipeline opposed FERC's motion to dismiss the two consolidated cases because it did not believe they were moot. It simultaneously

---

[3] "Constitution has not yet executed contracts with shippers committing to Project capacity." 2025 Petition, Att. C, 21.

filed cross motions for vacatur in case the Court found the petitions moot.[4] STP's

two briefs in opposition were distinct, but the one most relevant to the current

motion to dismiss concerns the 2014 Certificate Order. *See* Stop the Pipeline's

Opp. to Resp's Mot. to Dismiss for Mootness and in Support of Stop the

Pipeline's Mot. for Vacatur of the Orders, *Catskill Mountainkeeper, Inc., et al., v.*

*Fed Energy Regul. Comm'n*, Case No. 16-345, Doc. No. 420 (Feb. 5, 2021).[5] STP

argued that if FERC's certificate orders were not vacated, they could be revived in

the future. *Id*. at 2-8. In response, this Court ordered supplemental briefing on a

series of questions. *Id*. Doc. No. 439 (Apr. 26, 2021). Constitution Pipeline

Company, LLC (the "Company") assured this Court that "Constitution does not

intend to revive the Project in the foreseeable future[.]" *Id.* Doc. No. 442 at 6

(May 17, 2021). In response to the question about remanding the cases to FERC,

it acknowledged that a remand order issued by the Commission could be

appealed. "If, instead, the Court were to remand the proceedings to FERC with

instructions to [dismiss the agency proceedings], that could result in additional []

appeals from the forthcoming order(s) issued by FERC." *Id*. at 3.

---

[4] *See N.Y. State Dep't of Envt'l Conservation v. FERC,* Case No. 26-1422, Doc. No. 10, 2-8 (2d Cir. June 9, 2026) for a more complete background.

[5] STP's Opposition and Motion for vacatur in Case No. 19-4338 is Doc. No. 126 (Feb. 4, 2021).

The Company's December 2025 Petition contradicts what it told this Court in 2021. When it wanted STP's petition dismissed, it said it did not intend to revive the project, but a few years later it asked the Commission to reissue and reaffirm the vacated orders. *Constitution Pipeline Co., LLC*, Docket Nos. CP13-499-006 & CP18-5-005, Petition for Reissuance of Certificate Authority and Reaffirmance of Waiver Determination (Dec. 19, 2025), Accession No. 20251219-5626 (Att. C) ("2025 Petition"). Since a new application to FERC would trigger the need for a new application for a 401 water quality certification ("WQC"), 33 U.S.C. § 1341(a), it is asking FERC to rely on all the previously filed documents in the original dockets, ignoring the fact that those dockets were supposed to have been dismissed. "Unless otherwise stated in this Petition, all information submitted in Constitution's June 13, 2013, Certificate Application remains correct. Constitution incorporates by reference the exhibits from the original Certificate Application for the Project, the entire record of the Project in Docket No. CP13-499-000, and the waiver determination in Docket No. CP18-5-000." *Id*. at 3.

To avoid its statutory obligations to file a new application with FERC and the New York State Department of Environmental Conservation ("NYSDEC") under 15 U.S.C. § 717f(d) and 33 U.S.C. § 1341(a), the Company is acting as if the 2022 Mandate does not exist. For example, its citations of FERC's orders do

not indicate they were vacated. Att. C at n.4, 6, 12.  The Company also dismisses the significance of the Court's order by: (1) characterizing it as a "procedural" motion order, *id*. at 11, even though a three-member substantive panel (including the Chief Judge) made the decision; and (2) failing to acknowledge that the purpose of vacatur was to provide equitable relief to the Petitioners. In Attachment H, Permits and Authorizations, the Company lists the status of the application for a section 401 WQC as "waived," rather than stating that the waiver order had been vacated. (Att. D). While the decision to dismiss the cases for mootness may have been procedural, the decision to vacate the orders was rooted in both equity and statutory text. 5 U.S.C. § 706(2) ("The reviewing court shall . . . set aside agency action[.]"). This Court vacated the orders so the Company could not intentionally moot the case and then revive it, as Stop the Pipeline argued (and correctly predicted) was its intention. Case No. 16-345, Doc. No. 420, 2-8.

In its 2026 Remand Order, the Commission stated it was dismissing the proceedings in the old dockets. However, that statement lacks any meaning because FERC is now relying on all of the documents in the dockets it just "dismissed" as it considers the 2025 Petition. Therefore, the 2026 Remand Order fundamentally renders the 2022 Mandate meaningless. "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal

9

error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) (citations omitted).

Dismissing STP's petition to challenge the 2026 Remand Order would deny STP the opportunity to challenge it at all. In *Atlantic City Electric Company v. FERC*, the petitioners, various utility companies, sought judicial review of FERC orders they believed exceeded its jurisdictional authority. 329 F.3d 856, 857 (D.C. Cir. 2003). Petitioners sought review of the initial FERC orders. *Id.* at 857-58. At the conclusion of this review, the D.C. Circuit emphasized that FERC's original orders were beyond the jurisdiction of the Commission and vacated portions of the order. *Id.* at 856. This same issue returned to the Court after FERC issued an order on remand that was "determined to 'revisit the prospective balance of § 205 rights and responsibilities' implicated in [the Court's] opinion mandating the vacation of FERC's prior order . . . .'" *Id.* at 857-58. "Petitioners pray[ed] that we direct FERC to vacate those aspects of the remand order inconsistent" with its original mandate. *Id.* In coming to its decision to uphold its earlier mandate, the Court reaffirmed that FERC lacked jurisdiction. *Id.* It also stated that "on remand, FERC reconsidered and concluded that it still believed it was correct the first time." *Id.* at 859. Since STP believes FERC is disobeying this Court's 2022 Mandate, the issues at stake here bear a striking resemblance to those in *Atlantic City Electric Company*.

10

FERC claims that it has broad discretion to do as it pleases with its dockets, Resp.'s Br. at 15, but the two cases it cites, both involving Federal Power Act rate disputes, do not substantiate its claimed authority as to the issues here. *See MISO Transmission Owners v. FERC*, 45 F.4th 248, 262 (D.C. Cir. 2022) (quoting *Florida Mun. Power Agency v. FERC*, 315 F.3d 362, 366 (D.C. Cir. 2003)). The Florida Municipal Power Agency objected that the Commission had refused to consolidate its proceedings with a larger Rate Case. Neither case involved a court providing equitable relief to the petitioners by vacating multiple FERC orders after the project proponent decided not to build the project, thereby mooting the case to avoid judicial review. Neither case involved a court instructing the Commission to dismiss the proceedings after vacatur. Here FERC is claiming the right to consider the 2025 Petition (after the project proponent decided to build the project after all), which requires FERC to rely on all of the documents in the dismissed dockets. Thus, the authority FERC is claiming to have, has no basis in fact or law.

FERC's unprecedented maneuver, which it justified in its 2026 Remand Order, fundamentally voids this Court's 2022 Mandate without having appealed the decision. As a result, it establishes rights and obligations from which new legal consequences will flow. In its 2022 Mandate, this Court cited a number of cases to justify vacating FERC's orders. The judicial doctrine underlying its

11

decision was created to provide equitable relief to parties like Stop the Pipeline when their cases are rendered moot by happenstance. "The reference to 'happenstance' in *Munsingwear* must be understood as an allusion to this equitable tradition of vacatur. A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994). But that "unfairness" is exactly what is happening to Stop the Pipeline and its members now and is the root cause of its aggrievement. FERC's 2026 Remand Order has undermined the relief provided by this Court, which requires Stop the Pipeline to fight for what it already won. The effort it takes to regain what was granted takes time and resources, which is an ongoing injury. *See* Decl. of Mary Colleen McKinney, July 20, 2026 (Att. E). STP's members, many of whom are directly affected landowners, are also suffering direct injuries from the 2026 Remand Order. *See* Decl. of Stephen Fissel & Tania Konwinski, July 18, 2026 (Att. F). In addition, they are not receiving the process they are due under the Natural Gas Act, 15 U.S.C. §§ 717f(c)-(e), FERC's regulations, 18 C.F.R. §§ 157.5 – 157.14, or the Fifth Amendment. U.S. Const. amend. V.[6] "[The] Due Process Clause has been interpreted as preventing the

---

[6] Contrary to the claims made by FERC, Resp. Br. at 9, 11, Stop the Pipeline discussed the current due process injuries in its request for rehearing and cited

[Government] from denying potential litigants use of established adjudicatory procedures, when such an action would be 'the equivalent of denying them an opportunity to be heard upon their claimed right[s].'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 429-30 (1982) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 380 (1971)). Since the Company is requesting a decision before the end of this year,[7] landowners may soon be facing eminent domain proceedings. 15 U.S.C. § 717f(h). Thus, new legal consequences are flowing from the 2026 Remand Order, which authorized the use of these due process violations.

## II. STOP THE PIPELINE HAS CONSTITUTIONAL AND PRUDENTIAL STANDING

FERC argues that STP's petition must be dismissed due to its failure to meet Article III standing requirements and failure to allege facts establishing it was "aggrieved" under the NGA. Resp.'s Br. 2-3. To establish constitutional standing, a litigant must have suffered some actual injury caused by the defendant that can be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *PG & E Gas Transmission, Northwest Corp. v. FERC*, 315 F.3d 383, 387 (D.C. Cir. 2003); *Bennett*, 520 at 162 (1997).

---

examples filed in the new dockets. Request for Rehearing of Stop the Pipeline 20-24, Feb. 23, 2026, Accession No. 20260223-5140.

[7] *See* Williams' website timeline for the project, https://www.williams.com/expansion-project/constitution-pipeline/?tab=timelinetab-1 (last visited on July 13, 2026).

As discussed more fully below, STP satisfies all standing requirements. FERC's 2026 Remand Order goes beyond what this Court instructed it to do. By failing to faithfully follow this Court's 2022 Mandate, FERC justified its consideration of the Company's 2025 Petition in ways that are contrary to the well-established procedural requirements of the NGA, its own regulations, and the 2022 Mandate. Its unprecedented actions have: (1) violated the equitable relief provided by the 2022 Mandate to Stop the Pipeline; (2) forced Stop the Pipeline to expend time and resources to participate in unorthodox regulatory proceedings; (3) violated the due process rights of STP's members; (4) forced STP members to assist new stakeholders and landowners because FERC is not following the proper procedures; and (5) inhibited landowners from continuing to invest in their property. *See* McKinney & Fissel Declarations (Att. E and F). This Court can redress these injuries by vacating the offending paragraphs in the 2026 Remand Order and dismissing the current proceedings. 15 U.S.C. § 717r(b).

To be "aggrieved," a party must satisfy both constitutional and prudential standing requirements. *N.C. Utils. Comm'n v. FERC*, 761 Fed.Appx. 9, 10 (D.C. Cir. 2019) (citing *PNGTS Shipper's Group v. FERC*, 592 F.3d 132, 136 (D.C. Cir. 2010)). In Section I, *supra*, STP explained how it was aggrieved by the loss of the equitable relief granted by this Court and why FERC's 2026 Remand Order was final. It is uncontroverted that STP has complied with all the other jurisdictional

14

requirements in the NGA – it is a party to the underlying proceedings, timely requested rehearing, and timely filed a petition for review. 15 U.S.C. §§ 717r(a), (b).

### A. Stop the Pipeline and Its Members Are Being Injured by the Remand Order.

FERC contends that since "the Remand Order does not require Petitioners 'to do anything or to refrain from doing anything,' they 'suffer no concrete harm.'" Resp. Br. 11 (citing *Trump v. New York*, 592 U.S. 125, 134 (2020) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). To make that claim, FERC admits that it does not consider the impacts the proposed interstate gas pipeline has on the people who would be directly affected by it.[8] People's homes are generally their biggest asset and in rural areas, their land is treated like a member of their family. To protect it, they must now participate in a regulatory procedure they believe is contrary to the 2022 Mandate. Fissel Decl. ¶¶ 15-16; McKinney Decl. ¶¶ 1-6.

---

[8] In 2012, Anne and Robert Stack moved from Reno, Nevada to Davenport, NY, where they planned to build their retirement home. After having purchased their 97-acres of land and started the process, they learned the Company's proposed pipeline would pass right through their building site. They were forced to live with friends and family for a few years before deciding to buy a house in Delhi, NY. *See* Accession No. 20130715-5022; Accession No. 20260120-5000. The years of trauma they faced are not unusual. Joseph Bixby describes how just the possibility of the pipeline affected his grandparents and is now interfering with his plans on the farm. *See* Joseph Bixby, Accession No. 20260129-5175.

15

Once FERC justified its consideration of the 2025 Petition in its Remand Order, STP had to raise money and expend time and resources in order to fulfill its mission and preserve its rights. McKinney Decl. ¶¶ 7-8. Since STP is an all-volunteer organization, individual members have tried to help new landowners and members of the public who are unfamiliar with FERC's complex federal procedures. As a result, STP's members have suffered the economic consequences of trying to fill the gaps in the truncated review authorized by the 2026 Remand Order. *Id.* ¶ 9. STP also had to reestablish a website with information about the ongoing regulatory and legal proceedings.[9] Therefore, FERC's authorization of the new proceedings in the Remand Order has made STP and its members do things.

It has also made them refrain from doing things. There are four types of landowners and two types of stakeholders involved in the new proceedings. In terms of landowners, there are: (1) landowners who signed easement agreements approximately ten years ago and still own the land; (2) landowners who went through eminent domain proceedings in 2015 and had the court-ordered easements removed in 2020; (3) landowners who bought parcels with easements who did not participate in the prior proceedings; and (4) landowners who bought parcels without easements who did not participate in the prior proceedings. There are

---

[9] *See* https://stoptheconstitutionpipeline.org/.

stakeholders who participated in the prior proceedings and others who did not.

The due process violations for those who did not participate in the prior

proceedings are especially egregious.[10] For landowners without easements,

FERC's consideration of the 2025 Petition raises serious concerns about violations

of constitutional due process. U.S. Const. amend. V ("No person shall be …

deprived of life, liberty, or property, without due process of law[.]").

Many landowners who bought property along the proposed route after 2021

were told that the pipeline project was not going to be built.[11] After all, that is

what the Company told this Court in 2021 and it repeated that statement in its

assignment of easements that is recorded with the Schoharie County Clerk. Att. E,

Fissel Decl., Ex. 1. Relying on this Court's 2022 Mandate and other documents,

Stephen Fissel purchased property, developed personal and commercial plans for

its use, and then made substantial investments on his land with the understanding

that the pipeline would not be built. *Id.* ¶¶ 1, 2, 5-8. His and other people's plans

had to change after the 2026 Remand Order was issued because that was when the

---

[10] *See, e.g.*, Gina and Richard Craparotta, Accession No. 20260129-5124; Taffriece Forth-Moran, Accession No. 20260420-5019; John & Sheri Keating, Accession No. 20260126-5078; Stacy Makarewicz, Accession No. 20260128-5059; Maria Moscatelli, Accession No. 20260526-0001; Michela & Michael Sodomora, Accession No. 20260129-5529; and Wayne Tufts, Accession No. 20260120-5043.

[11] *See, e.g.*, Stephen Fissel, Accession No. 20260127-5127 and Harry P. Manesis, Accession No. 20260129-5234.

Commission made it clear that it was going to review the 2025 Petition after dismissing the proceedings. This was a shock to STP. Att. E, McKinney Decl., ¶¶ 6-7. For Stephen Fissel, who bought 82 acres of land in May 2023 and developed extensive plans with his fiancée for transforming it into a sustainable farm, the expedited proceedings authorized by the 2026 Remand Order meant he was not going to purchase and install a large Geothermal 4-Season Greenhouse this year as he had planned. *Id*. ¶¶ 9-11. Thus, STP and its members had to both do things and refrain from doing others because of the Remand Order.

Since the NGA triggers condemnation proceeding, it has strict procedural requirements. 15 U.S.C. §§ 717f(c)-(e). "Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and … served … in such manner as the Commission shall, by regulation, require." 15 U.S.C. § 717f(d). FERC's regulations require many documents to be submitted with the application. 18 C.F.R. §§ 157.5 – 157.14. Noncompliance is supposed to result in rejection. 18 C.F.R. § 157.8. Here, even though no application or supporting documents were filed and FERC's regulations are not being followed, the 2025 Petition was not rejected. Instead, a vacated certificate order may be reissued in 2026 and the project constructed in 2027 without the required 401 WQC from the NYSDEC.

18

"[I]t is axiomatic . . . 'that an agency is bound by its own regulations'. . . an agency does not have authority to 'play fast and loose with its own regulations.'" *Nat'l Envtl. Dev Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)). FERC's recent actions in defying the NGA indicate that it is, in fact, playing fast and loose with its own regulations. Further, by incorporating thirteen-year-old documents from the original project's dismissed application, FERC is attempting to evade the statutory and regulatory safeguards meant to protect due process. The procedural injuries that are occurring now are a direct result of the Remand Order, which authorizes FERC's evasion of its legal obligations.

FERC's Order on Remand has resulted in harm to STP and its members because it has made them do things and refrain from doing others. *Trump*, 592 U.S. at 134. They have also been injured by FERC's due process violations and aggrieved by the loss of equitable relief provided by this Court. In addition, by not requiring the Company to file a new application, as specified in the NGA, 15 U.S.C. § 717f(d), FERC is allowing the Company to avoid applying for a 401 WQC from NYSDEC, as required under the Clean Water Act, 33 U.S.C. § 1341(a). Thus, the injuries stemming from the 2026 Remand Order are both concrete and particularized. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

19

**B. Stop the Pipeline's Injury Is Directly Caused by FERC's Failure to Adhere to the 2022 Mandate in Its Remand Order.**

In its Motion to Dismiss, FERC also contends that "rehearing parties do not and cannot identify any injury in fact attributable" to the dismissal of proceedings, as instructed by this Court, in Case Nos. 16-345 and 19-4338. Resp.'s Br. 11. However, as described *supra*, in Sections I and I.A., STP's injuries are caused by the fact that the Commission went beyond dismissing the proceedings in its 2026 Remand Order by authorizing the continued consideration of the 2025 Petition and by claiming it was allowed to do so under the 2022 Mandate. The Commission's expansion of its authority to reissue vacated orders cannot be remedied by challenging a future order because under the strict jurisdictional requirements of NGA, 15 U.S.C. §§ 717r(a), (b), this is the only opportunity to challenge the offending language in the 2026 Remand Order.

**C. Stop the Pipeline's Injuries Would Be Redressed by a Favorable Judicial Decision.**

Finally, FERC contends that NYSDEC does not seek "any identifiable relief at this time…." Resp.'s Br. 18. As discussed *supra*, in Section I, FERC misrepresents the significance of its 2026 Remand Order, and the offending passages must be challenged now because of the NGA's jurisdictional requirements. STP requested that its petition be consolidated and put in abeyance to save time and resources, not because of a lack of ripeness or redressability. Its

20

request is a direct result of FERC's expedited review of the 2025 Petition.[12] As of July 1, 2026, the Company was requesting a final decision in the 3rd quarter of 2026, but recently moved that deadline to the 4th quarter. Under this expedited schedule, double briefing is an unnecessary burden on all parties and this Court.

To provide proof of standing also requires a petitioner to show that its injury can be redressed by a favorable judicial decision. *Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 888 (D.C. Cir. 2023). Unlike in *Fore River Residents*, Stop the Pipeline's injuries are *directly* caused by FERC's authorization of the current proceedings in its 2026 Remand Order because those proceedings have unjustly removed the equitable relief provided by this Court in its 2022 Mandate and denied STP and its members their due process rights. These injuries would be remedied by vacating the offending paragraphs and dismissing the current proceedings, which is the relief STP requested. *See* Form C-A, Add. B, 1, Doc. No. 10. In addition, by requiring the Company to follow the procedures specified in the NGA, 15 U.S.C. § 717f(c)-(e), and FERC's regulations, 18 C.F.R. §§ 157.5 – 157.14, the Company would be obligated to apply for a 401 WQC from NYSDEC. 33 U.S.C. § 1341(a). Thus, STP's injuries would be redressed by a favorable judicial decision.

---

[12] The Company wants to place the pipeline in service by May 2028. *See* 2025 Petition, Att. C, 41 and n.7 *supra*.

## CONCLUSION

The Commission's 2026 Remand Order is the final agency action in the prior proceedings and the paragraphs in that order that authorize the current proceedings are causing STP and its members injuries that can be redressed by this Court. Therefore, Stop the Pipeline's petition should not be dismissed. Since the Company is asking the Commission to re-issue its 2014 certificate of public convenience and necessity during the fourth quarter of 2026, STP asks that its petition be put in abeyance until a final order is issued so that its rights are preserved and double briefing can be avoided.

Respectfully submitted,

/s/ *Todd D. Ommen*
TODD D. OMMEN
ANNE MARIE GARTI, OF COUNSEL
PACE ENVIRONMENTAL LITIGATION CLINIC
78 N Broadway
White Plains, NY 10603
(914) 422-4391
tommen@law.pace.edu

DATED: July 27, 2026
White Plains, New York

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that the foregoing Response in Opposition to Respondent's Motion to Dismiss complies with the type-volume limitation of Rule 27(d)(2)(A) as it contains 5,180 words, excluding the parts of the brief exempted by Rules 27(d)(2) and 32(f). I further certify that it complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) as this paper was prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Todd D. Ommen
Todd D. Ommen
PACE ENVIRONMENTAL LITIGATION CLINIC
78 N Broadway
White Plains, NY 10603
(914) 422-4391
tommen@law.pace.edu

DATED: July 27, 2026
White Plains, New York

# ATTACHMENT A

# Mandate of the United States Court of Appeals for the Second Circuit

# MANDATE

FERC
CP18-5-000
CP18-5-001
CP18-5-002
CP18-5-003
CP13-499-000
CP13-499-001
CP13-502-000
CP13-502-001

## United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 18th day of November, two thousand twenty-one.

Present:

Debra Ann Livingston,
*Chief Judge,*
John M. Walker, Jr.,
Richard C. Wesley,
*Circuit Judges.*

---

New York State Department of Environmental Conservation, et al.,

*Petitioners,*

v.

Federal Energy Regulatory Commission,

*Respondent.*

19-4338 (L),
20-158 (Con),
20-208 (Con)

---

Catskill Mountainkeeper, Inc., et al.,

*Petitioners,*

v.

16-345 (L),
16-361 (Con)

**MANDATE ISSUED ON 1/10/2022**

Federal Energy Regulatory Commission,

*Respondent*,

Constitution Pipeline Company, LLC, et al.,

*Intervenors*.

---

The above-captioned proceedings are consolidated for purposes of this order. Respondent moves to dismiss as moot these petitions for review; Petitioner Stop the Pipeline moves to dismiss the petitions docketed in 2d Cir. 19-4338, 20-158, and 20-208 for lack of jurisdiction, and moves for vacatur of the underlying agency orders. Environmental & Natural Resources Law Clinic of Widener University Delaware Law School moves to file an amicus brief. Upon due consideration, it is hereby ORDERED that Respondent's motions to dismiss are GRANTED and Stop the Pipeline's motions to dismiss for lack of jurisdiction are DENIED as moot. It is further ORDERED that Stop the Pipeline's motions for vacatur are GRANTED, the underlying agency orders are VACATED, and the cases are REMANDED with instructions to dismiss the agency proceedings. *Lamar Advert. of Penn, LLC v. Town of Orchard Park, New York*, 356 F.3d 365, 375 (2d Cir. 2004) ("The voluntary cessation of allegedly illegal conduct usually will render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." (internal quotation marks omitted)); *Radiofone, Inc. v. Fed. Commc'ns Comm'n*, 759 F.2d 936, 940–41 (D.C. Cir. 1985) (finding vacatur appropriate where agency order was "moot for a reason that deprives the agency action of all operative effect"); *see Bragger v. Trinity Capital Enter. Corp.*, 30 F.3d 14, 17 (2d Cir. 1994) ("When a civil case becomes moot while an appeal is pending, it is the general practice of an appellate court to vacate the unreviewed judgment granted in the court below and remand the case to that court with directions to dismiss it.") (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40 (1950)). Finally, it is ORDERED that the motion to file an amicus brief is DENIED as moot.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

2

# ATTACHMENT B

# Stop the Pipeline Jan. 14, 2026 Letter to FERC (without attachments)

# PACE ENVIRONMENTAL LITIGATION CLINIC

JOHN JAY LEGAL SERVICES, INC.

ELISABETH HAUB SCHOOL OF LAW

78 NORTH BROADWAY

WHITE PLAINS, NEW YORK 10603

PHONE: 914.422.4343

FAX: 914.422.4437

| OF COUNSEL | SUPERVISING ATTORNEY | ADMINISTRATOR |
|---|---|---|
| KARL S. COPLAN | TODD D. OMMEN | JENNIFER RUHLE |

January 14, 2026

**<u>Via email and Electronic Filing</u>**
Robert H. Solomon, Esq., Solicitor
Federal Energy Regulatory Commission
888 1st Street, N.E.
Room 9A-01
Washington, DC 20426
Robert.Solomon@ferc.gov

      Re: Matter of Constitution Pipeline Company, LLC, Dkt. Nos. CP13-499, CP13-502, CP18-5

Dear Mr. Solomon,

On behalf of Stop the Pipeline, we write to join in the request made by the Office of the New York State Attorney General in a letter dated January 13, 2026, which is attached. The Federal Energy Regulatory Commission must immediately "dismiss the agency proceedings" as instructed by the United States Court of Appeals for the Second Circuit on November 18, 2021. *N.Y. State Dep't of Env't Conservation, et al. v. Fed. Energy Regulatory Comm'n,* 20-cv-158 (2d. Cir. Nov. 18, 2021), ECF No. 161; *Stop the Pipeline v. Federal Energy Regulatory Comm'n*, 16-cv-361 (2d. Cir. Nov. 18, 2021), ECF No. 411.

                Respectfully submitted,

                Todd D. Ommen
                Anne Marie Garti, Esq, of counsel.

Cc:
Brian Lusignan, Esq.
John Broderick, Esq.
Andrea Oser, Esq.
Debbie-Anne A. Reese, Secretary, Office of the Secretary of FERC
Susanna Chu, Esq., Office of the General Counsel, FERC
Michael R. Pincus, Esq.
Michael Diamond, Esq.
Stephen A. Hatridge, Esq.
Moneen Nasmith, Esq.,

Susan Kraham, Esq.,
Kacy Manahan, Esq.

# ATTACHMENT C

# Constitution Pipeline Petition
# (without attachments)

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **In the Matter of** | ) | Docket Nos.   CP13-499-___ |
| **Constitution Pipeline Company, LLC** | ) | CP18-5-___ |
| | ) | |

**PETITION OF CONSTITUTION PIPELINE COMPANY, LLC**
**FOR REISSUANCE OF CERTIFICATE**
**AND REAFFIRMANCE OF WAIVER DETERMINATION**

**(Constitution Pipeline Project)**

Communications with respect to this application should be addressed to:

*Michael R. Pincus
*Michael Diamond
Travis Malesky
Christopher G. Hanson
Van Ness Feldman LLP
2000 Pennsylvania Ave. NW, Suite 6000
Washington, D.C. 20006
(202) 298-1800

Stephen A. Hatridge,
Vice President & Assistant General Counsel
*Francesca Ciliberti,
Senior Counsel
*Katherine Liberty,
Senior Counsel
Constitution Pipeline Company, LLC
Post Office Box 1396
Houston, Texas 77251-1396
(713) 215-2000

A copy should also be sent to:

Liz Bowman
Vice President, Government Affairs &
Outreach
The Williams Companies, Inc.
555 13th Street NW Suite 440W
Washington, D.C. 20004-1109
(713) 215-2000

Filed: December 19, 2025

* Designated to receive service in accordance with Rule 2010 of the Commission's Rules of
Practice and Procedure. 18 C.F.R. § 385.2010 (2025).

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | | |
|---|---|---|---|
| **In the Matter of** | ) | | |
| **Constitution Pipeline Company, LLC** | ) | **Docket Nos.** | **CP13-499-___** |
| | ) | | **CP18-5-___** |

**PETITION OF CONSTITUTION PIPELINE COMPANY, LLC**
**FOR REISSUANCE OF CERTIFICATE**
**AND REAFFIRMANCE OF WAIVER DETERMINATION**

**(Constitution Pipeline Project)**

Pursuant to Section 7(c) of the Natural Gas Act ("NGA"),[1] Part 157, subpart A of the regulations of the Federal Energy Regulatory Commission ("FERC" or "Commission"),[2] and Rule 207 of the Commission's Rules of Practice and Procedure,[3] Constitution Pipeline Company, LLC ("Constitution") respectfully requests that the Commission reissue a certificate of public convenience and necessity authorizing Constitution to construct and operate the Constitution Pipeline Project (the "Project"). Constitution also asks the Commission to affirm that, given that the Commission has already determined that the New York State Department of Environmental Conservation ("NYSDEC") waived its authority under Section 401 of the Clean Water Act ("CWA") to issue or deny a water quality certification for the Project ("401 Waiver Order"), NYSDEC's waiver continues to apply to the portion of the Project located in New York State.

The Commission approved the Project in 2014, but it was never built.[4] The Project

---

[1] 15 U.S.C. § 717f(c).
[2] 18 C.F.R. pt. 157, subpart A (2025).
[3] *Id.* § 385.207.
[4] *Constitution Pipeline, Co.*, 149 FERC ¶ 61,199 (2014) ("Certificate Order"), *reh'g denied*, 154 FERC ¶ 61,046 (2016) ("Rehearing Order"). The Certificate Order also authorized a related project, Iroquois Gas Transmission System, L.P.'s ("Iroquois") Wright Interconnect Project, which will add new compression facilities and modify existing compression facilities at the Wright Compressor Station in Schoharie County, New York. The Wright Interconnect Project is designed to provide 650,000 dekatherms ("Dth") per day of firm transportation service from the Constitution Pipeline Project to Iroquois' existing mainline and

was designed to provide up to 650,000 Dth per day of firm transportation capacity from gas-rich production areas in northern Pennsylvania to gas-hungry markets in New York and New England. The Project was one of several pipelines planned to capture the benefits of transporting gas from the Marcellus Shale formation—the largest, lowest cost, and lowest methane-intensity production basin in the country—to neighboring New York and New England, where homes and businesses pay the highest costs for natural gas in the country and suffer significant risks to reliability of both natural gas and electric power service.

Despite the Commission's approval, development of the Project was halted because NYSDEC failed to act on Constitution's requests within a reasonable time, and ultimately denied, Constitution's application for a water quality certification under Section 401 of the CWA.[5] While the Commission finally determined in 2019—five years after issuing the Certificate Order—that NYSDEC had waived its authority to issue the water quality certification,[6] Constitution announced in 2020 that, due to the delays and associated ballooning costs, it would no longer pursue the Project.[7]

Constitution revived the Project in early 2025 in response to persistently high natural gas and electricity prices, growing demand for energy, and ongoing reliability challenges in the Northeast. The need for pipeline projects like Constitution was

---

Tennessee Gas Pipeline Company, L.L.C.'s ("Tennessee Gas") pipeline system. Iroquois has indicated that it will soon file a separate petition for reissuance of the certificate approving the Wright Interconnect Project.

[5] A chronology of Constitution's efforts to obtain a water quality certification from NYSDEC is provided in Section II.B., *infra*.

[6] *Constitution Pipeline Co.*, 168 FERC ¶ 61,129, at P 1 ("401 Waiver Order"), *order denying reh'g and stay*, 169 FERC ¶ 61,199 (2019) ("401 Waiver Rehearing Order"). NYSDEC appealed the Commission's finding of waiver in federal court. Petition for Review, New York State Department of Environmental Conservation v. FERC, Nos. 19-4338, *et al.* (2d Cir. Dec. 30, 2019), ECF No. 1.

[7] Reuters, *Willams cancels N.Y. Constitution natgas pipeline* (Feb. 24, 2020), https://www.reuters.com/article/business/energy/williams-cancels-ny-constitution-natgas-pipeline-idUSL2N2AO11B/.

acknowledged in President Trump's day-one Executive Orders declaring a national energy emergency and directing the Commission and other federal agencies to support infrastructure development specifically in the Northeast.[8]

Constitution respectfully requests that the Commission reissue a certificate of public convenience and necessity authorizing the Constitution Pipeline Project and include in its order issuing a certificate an affirmation that the 401 Waiver Order still applies to the New York State portion of the Project. Constitution is committed to providing the Commission with information needed to demonstrate that the Project is required by the public convenience and necessity and looks forward to addressing any questions concerning the Project.

## I.    GENERAL

Unless otherwise stated in this Petition, all information submitted in Constitution's June 13, 2013, Certificate Application remains correct.[9] Constitution incorporates by reference the exhibits from the original Certificate Application for the Project, the entire record of the Project in Docket No. CP13-499-000, and the waiver determination in Docket No. CP18-5-000.[10]

The exact legal name of Constitution is Constitution Pipeline Company, LLC, a limited liability company formed and existing under the laws of the State of Delaware.

---

[8] *Declaring a National Energy Emergency*, Exec. Order No. 14,156 § 3(b), 90 Fed. Reg. 8433, 8434 (Jan 29, 2025) (directing federal agencies to use all "authorities available to them to facilitate the . . . transportation of energy in and through the . . . Northeast."); *Unleashing American Energy*, Executive Order No. 14,154 § 5(d), 90 Fed. Reg. 8353, 8355-56 (Jan. 29, 2025) (directing agencies to "use all possible authorities, including emergency authorities, to expedite the adjudication of Federal permits" for "any project . . . deem[ed] essential for the Nation's economy or national security.").

[9] Application of Constitution Pipeline Co. for Certificates of Public Convenience and Necessity, Docket Nos. CP13-499-000, *et al.* (June 13, 2013) ("Certificate Application").

[10] Petition for Declaratory Order of Constitution Pipeline Co., Docket No. CP18-5-000 (Oct. 11, 2017) ("Waiver Petition").

Constitution's principal place of business is 2800 Post Oak Boulevard, Houston, Texas 77056-6106. Constitution is a wholly owned, indirect subsidiary of The Williams Companies, Inc ("Williams"). Upon the commencement of operations under the reissued certificate order, Constitution will become a natural gas company within the meaning of section 2(6) of the NGA[11] and, as such, will be subject to the jurisdiction of the Commission. Constitution will provide natural gas transportation service in interstate commerce under the terms of its FERC Gas Tariff, a *pro forma* copy of which was included in Constitution's original Certificate Application and approved subject to condition in the Certificate Order.

The names, titles, addresses, and telephone numbers of the persons to whom correspondence and communications concerning this application are to be addressed are:

*Michael R. Pincus
*Michael Diamond
Travis Malesky
Christopher G. Hanson
Van Ness Feldman LLP
2000 Pennsylvania Ave. NW, Suite 6000
Washington, D.C. 20006
(202) 298-1800
mrp@vnf.com
mmd@vnf.com
tmalesky@vnf.com
chanson@vnf.com

A copy should also be sent to:

Liz Bowman
Vice President, Government Affairs &
Outreach
The Williams Companies, Inc.
555 13th Street NW Suite 440W
Washington, D.C. 20004-1109
(713) 215-2000
liz.bowman@williams.com

Stephen A. Hatridge,
Vice President & Assistant General Counsel
*Francesca Ciliberti,
Senior Counsel
*Katherine Liberty,
Senior Counsel
Constitution Pipeline Company, LLC
Post Office Box 1396
Houston, Texas 77251-1396
(713) 215-2000
stephen.a.hatridge@williams.com
francesca.ciliberti-ayres@williams.com
katherine.liberty@williams.com

---

[11] 15 U.S.C. § 717a(6).

4

\* Designated to receive service in accordance with Rule 2010 of the Commission's Rules of Practice and Procedure. 18 C.F.R. § 385.2010.

## II.    BACKGROUND

### A.    Project Description

The Commission authorized the Constitution Pipeline Project in 2014,[12] but because of continuing permitting and regulatory delays, Constitution determined in 2020 to suspend further development of the Project. The Project was designed to transport gas from Marcellus Shale production areas in North Central Pennsylvania to major markets in New York and New England. Constitution stated in its Certificate Application that by providing reliable access to these new natural gas supplies, the Project would enhance the Nation's energy security and support reduced costs of natural gas and electricity.[13]

As approved in the Certificate Order, the Project would have involved construction of approximately 125 miles of 30-inch pipeline extending from Susquehanna County, Pennsylvania, to Schoharie County, New York, along with receipt, delivery, and other appurtenant facilities. The Project facilities are nearly identical to the original Project facilities as analyzed in the Final Environmental Impact Statement[14] and Certificate Order. Constitution requested limited variances from the Commission over the course of its

---

[12] Certificate Order, 149 FERC ¶ 61,199; Rehearing Order, 154 FERC ¶ 61,046.

[13] Certificate Application at 16-17.

[14] Final Environmental Impact Statement re Constitution Pipeline and Wright Interconnect Projects, Docket No. CP13-499-000, *et al.*, at 1-2 – 1-4 (Oct. 24, 2014) ("Final EIS").

development of the Project and incorporates by reference the Commission-approved variances[15]—all of which were located in Pennsylvania—into its current Project design.[16]

The Project continues to include:

- Approximately 125 miles of 30-inch pipeline extending from Susquehanna County, Pennsylvania, through Broome, Chenango, Delaware, and Schoharie Counties, New York;

- A receipt meter station located in Susquehanna County, Pennsylvania (Turnpike Road metering and regulating ("M&R") Station);

- A receipt tap located in Susquehanna County, Pennsylvania;

- A meter, regulation, and delivery station located at Iroquois' Wright Compressor Station property in the Town of Wright, Schoharie County, New York (Westfall Road M&R Station);

- Mainline valve assemblies at 11 locations along the Project;

- Pig launcher/receiver facilities and pig trap valves at the Turnpike Road M&R Station and the Westfall Road M&R Station; and

- Cathodic protection and other related appurtenant facilities.

The Project will provide service to a proposed interconnection with Iroquois at a new transfer compressor station in Wright, New York, and through a capacity lease on Iroquois to delivery points on the existing systems of Iroquois and Tennessee Gas. Iroquois' project, referred to as the Wright Interconnect Project, was approved together with the

---

[15] *See* Letter Order, Partial Notice to Proceed with Tree Felling and Variance Requests, Docket No. CP13-499-000 (Jan. 29, 2016) ("2016 Letter Order").

[16] Constitution is also evaluating a potential ten-mile lateral in Pennsylvania, which would add additional supply of natural gas for increased reliability and flexibility. If Constitution decides to move forward with this lateral, Constitution will file an amendment application.

6

Constitution Pipeline Project in the Certificate Order, but never developed. Iroquois has indicated that it will file a separate petition for reissuance of its certificate authority to construct and operate the Wright Interconnect Project soon after this Petition is filed.

**B.**     **Despite Efforts Beginning in 2012, Constitution Halted Development of the Project in 2020 Following Costly Permitting and Regulatory Delays**

The Commission approved the Constitution Pipeline Project in 2014 following a year-long pre-filing process[17] and 18 months of review of the Project's economic and environmental impacts.[18] The Commission concluded that given the strong demand for Project capacity, "the public convenience and necessity require[d] [its] approval."[19] The Commission also granted a blanket certificate authorizing Constitution to provide open-access transportation service pursuant to Section 284.221 of its regulations, and a blanket certificate authorizing future facility construction, operation, and abandonment pursuant to Section 157.204 of its regulations.[20]

Notwithstanding the Commission's approval, the Project became mired in undue delays concerning its application for a water quality certification from NYSDEC under Section 401 of the CWA.[21] Section 401 gives state agencies, such as NYSDEC, an opportunity to certify whether a project has demonstrated compliance with the state's water

---

[17] *See generally* Docket No. PF12-9-000.

[18] The Commission conducted a comprehensive environmental review and specifically addressed all major areas of concern, which included karst geology; waterbodies and wetlands; interior forests and migratory birds; invasive plant species; environmental compliance enforcement; rare bat species; homeowners' insurance and property values; safety; indirect climate impacts; cumulative environmental impacts and possible alternatives. *See* Certificate Order, 149 FERC ¶ 61,199 at P 73.

[19] *Id.* PP 29, 24-29; Rehearing Order, 154 FERC ¶ 61,046 at PP 15-23.

[20] Certificate Order, 149 FERC ¶ 61,199 at PP 44-45 and ordering para. (B) & (C). Constitution notes that unlike its certificate authorizing it to construct the pipeline, the blanket construction and transportation certificates were not made subject to conditions and are still in effect. To the extent the Commission needs to reissue those certificates, Constitution requests that the Commission do so.

[21] *See generally* Steven A. Weiler & Marcia A. Stanford, *New York's Denial of Water Quality Certification for Three FERC-Authorized Pipelines: Flagrant Fiat or Valid Veto?*, 39 Energy L. J. 503, 514-15 (2018) https://www.eba-net.org/wp-content/uploads/2023/02/21-503-540-Weiler_FINAL.pdf.

quality standards.[22] Critically, the CWA provides that if a certifying agency such as NYSDEC "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements . . . shall be waived."[23]

Constitution applied to NYSDEC for a water quality certification on August 22, 2013.[24] NYSDEC requested an environmental impact statement, then more information, then asked Constitution to withdraw and resubmit its application to allow the agency more time for analysis.[25] In response to NYSDEC's request, Constitution withdrew and resubmitted its application on May 9, 2014. NYSDEC subsequently requested even more information, and nearly a year later it again asked Constitution to withdraw and re-submit its application.[26] Constitution complied, withdrawing and re-submitting its application on April 27, 2015.[27]

On April 22, 2016, two years and eight months after Constitution filed its application, NYSDEC issued a letter denying Constitution's application for a water quality certification for the New York portion of the Project.[28] NYSDEC's decision was hailed by

---

[22] 33 U.S.C. § 1341(a)(1).

[23] *Id.*

[24] 401 Waiver Order, 168 FERC ¶ 61,129 at P 4. Note that like NYSDEC, the Pennsylvania Department of Environmental Protection ("PADEP") has authority to issue water quality certifications in that State. The PADEP issued its water quality certification for the Pennsylvania portion of the Project on September 5, 2014, five months after receiving Constitution's Section 401 application.

[25] A detailed chronology of Constitution's Section 401 application process is available in Constitution's October 11, 2017 Waiver Petition that NYSDEC had waived its authority to issue a Section 401 certification by failing to act on its request for certification within a year. *See also Constitution Pipeline Co. v. N.Y. State Dep't of Env't Conservation*, 868 F.3d 87, 91-98 (2d Cir. 2017), *cert. denied*, 584 U.S. 962 (2018) (denying appeal of denial of water quality certification).

[26] 401 Waiver Order, 168 FERC ¶ 61,129 at PP 4, 6.

[27] *Id.* P 6.

[28] As noted below, NYSDEC's order denying Constitution's Section 401 application was issued long after NYSDEC had waived its authority under Section 401. *See* Constitution October 11, 2017 Petition for Declaratory Order, Docket No. CP18-5-000, app. at 003181-94 (reproducing NYSDEC's April 22, 2016 Water Quality Certification/Notice of Denial); 401 Waiver Order at P 6.; *see also* Scott Waldman, *Cuomo's pipeline decision may have ripple effects for energy policy*, Politico (Apr. 27, 2016),

8

project opponents as a "turning of the tide" against gas projects in New York and a "political test of [then-New York] Governor Cuomo's environmental legacy."[29]

Constitution continued its efforts to develop the Project, appealing NYSDEC's purported denial of the certification in federal court and separately seeking a petition for declaratory order from the Commission requesting that the Commission find that NYSDEC had waived its authority under Section 401 by failing to act on Constitution's request for certification within a year.[30]

The drawn-out certification process and resulting litigation forced Constitution to ask the Commission for two extensions of time to construct the Project, the first in 2016 and the second in 2018. The Commission granted both extensions, recognizing that despite its challenges with NYSDEC, Constitution was "diligently pursuing completion of the project."[31]

Finally, after years of litigation and a decision by the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") in *Hoopa Valley Tribe v. FERC,* an unrelated case in which the court struck down an equivalent "coordinated withdrawal-and-resubmission scheme" used by California and Oregon to delay action on an application for

---

https://www.politico.com/states/new-york/albany/story/2016/04/cuomos-pipeline-decision-may-have-ripple-effects-for-energy-policy-101093.

[29] Scott Waldman, *Cuomo administration rejects Constitution pipeline*, Politico (Apr. 22, 2016), https://www.politico.com/states/new-york/albany/story/2016/04/cuomo-administration-rejects-constitution-pipeline-101005.

[30] *Constitution Pipeline v. N.Y. State Dep't of Env't Conservation*, 868 F.3d at 99; *Constitution Pipeline Co.*, 162 FERC ¶ 61,014 (denying Waiver Petition), *reh'g denied*, 164 FERC ¶ 61,029 (2018), *pet. for review*, Constitution Pipeline Co. v. FERC, No. 18-1251 (D.C. Cir. Sept. 14, 2018) (voluntary remand).

[31] *Constitution Pipeline Co.*, Letter Order, Docket No. CP13-499-003 (July 26, 2016) (order granting first extension request), *reh'g denied*, 157 FERC ¶ 61,145, at P 4 (2016); *Constitution Pipeline Co.*, 165 FERC ¶ 61,081, at P 10 (2018) (order granting second extension request), *reh'g denied*, 169 FERC ¶ 61,102, at P 21 (2019).

a water quality certification,[32] the Commission determined in 2019 that NYSDEC waived its authority under CWA Section 401 to issue or deny a water quality certification for the Project.[33] The Commission found that "[NYSDEC's] and Constitution's actions in connection with a withdrawal and resubmission scheme for the purpose of avoiding section 401's one-year time limit for state action are, as relevant here, analogous to the agreement between the parties in *Hoopa Valley*."[34] The Commission concluded that the "[NYSDEC] failed or refused to act on Constitution's request for a water quality certification within the one-year period running from Constitution's first resubmission on May 9, 2014, to a deadline of May 9, 2015—i.e., that the April 27, 2015 withdrawal and resubmission *did not restart the one year clock for waiver*" and that the NYSDEC's later purported denial of Constitution's water quality certification application by had "no legal significance."[35] Undeterred, NYSDEC and other Project opponents appealed both the Commission's Certificate Order and the 401 Waiver Order in the U.S. Court of Appeals for the Second Circuit ("Second Circuit").

At this point, Constitution had invested over seven years and $354 million into the Project, with the years of regulatory uncertainty and litigation having increased the Project's costs from an estimated $683 million to roughly $1 billion as of 2020.[36] On

---

[32] 913 F.3d 1099, 1103 (D.C. Cir. 2019) (determining that "a state waives its Section 401 authority when, pursuant to an agreement between the state and applicant, an applicant repeatedly withdraws-and-resubmits its request for water quality certification over a period of time greater than one year.").

[33] 401 Waiver Order, 168 FERC ¶ 61,129; 401 Waiver Rehearing Order, 169 FERC ¶ 61,199.

[34] 401 Waiver Order, 168 FERC ¶ 61,129 at PP 34 & 40.

[35] *Id.* (emphasis added).

[36] *See* Mary Esch, *Costs, delays scuttle 124-mile Constitution Pipeline Project*, AP News (Feb. 24, 2020), https://apnews.com/general-news-468d090d04e702a32be11e33ecc26fa4.

November 24, 2020, Constitution reported to the Commission that it was suspending work on the Project.[37]

Since Constitution had announced it would not be pursuing the Project, the Second Circuit dismissed the appeals as moot. Consistent with its standard practice, the court also vacated both Commission orders on procedural grounds.[38] The court made no findings on the merits. In any event, in light of the *vacatur*, and as further set forth in Part V below, Constitution respectfully requests that the Commission affirm that its determination in the 401 Waiver Order still applies to the Project.

### C.       Constitution Resumed Development of the Project in 2025

Since 2021, market conditions and increasing reliability concerns have underscored the need for the Project. Gas prices in the Northeast have risen more than 2.5 times over the national benchmark of Henry Hub's winter average in the past 15 years,[39] and prices continue to rise despite the Northeast's proximity to the Nation's most abundant and lowest-cost production in the Marcellus Shale region.[40] On his first day in office, President Trump issued Executive Order No. 14,156, *Declaring a National Energy Emergency*, in which he declared that "inadequate development" of pipeline infrastructure is threatening national security and causing excessive energy prices, particularly in the Northeast.[41] Executive Order No. 14,156 focuses on the adverse impacts that "dangerous State and local

---

[37] Constitution Pipeline Co. Project Status Update and Final Monitoring Report at 1, Docket Nos. CP13-499-000, *et seq.* (Nov. 24, 2020).

[38] Motion Order, New York State Department of Environmental Conservation v. FERC, Nos. 19-4338, *et al.* (2d Cir. Nov. 18, 2021), ECF No. 161 (citing *Radiofone, Inc. v. FCC*, 759 F.2d 936, 940-41 (D.C. Cir. 1985) (finding vacatur appropriate where agency order was "moot for a reason that deprives the agency action of all operative effect")).

[39] S&P Global, *Constitution Pipeline Market Impact Report*, at 17 (Nov. 2025) ("S&P Study"), https://view.highspot.com/viewer/41207f04c15a7c5f88b8fb2f90dc45c9#1, Attachment A, hereto.

[40] *Id.* at 13.

[41] Exec. Order No. 14,156 § 1, 90 Fed. Reg. 8433, 8433.

11

policies" have had upon the development of energy infrastructure in the Northeast, and directs federal agencies to use all "authorities available to them to facilitate the . . . transportation of energy . . . in and through . . . the Northeast."[42] That same day, President Trump also issued Executive Order No. 14,154, *Unleashing American Energy*, which similarly directs agency heads to "use all possible authorities, including emergency authorities, to expedite the adjudication of Federal permits" for "any project . . . deem[ed] essential for the Nation's economy or national security." [43]

The Constitution Pipeline Project has emerged as a key component in addressing the National Energy Emergency and lowering natural gas prices in the Northeast. President Trump himself has taken active interest in facilitating development of the Project,[44] and Environmental Protection Agency Administrator Lee Zeldin has stated that building the Project is "vital for New England's grid stability" and to reduce energy prices.[45]

Constitution has been in discussions with federal and state officials about developing the Project and formally commenced regulatory work by filing a request for a water quality certification from NYSDEC on May 30, 2025.[46] Constitution noted that its renewed application for a water quality certification was "subject to a full reservation of

---

[42] *Id.* §§ 1 and 3(b), 90 Fed. Reg. at 8434.

[43] Exec. Order No. 14,154 § 5(d), 90 Fed. Reg. 8353, 8355-56.

[44] Reuters, *Williams says it welcomes Trump's support for Constitution gas pipeline* (Mar. 14, 2025) https://www.reuters.com/world/us/williams-says-it-welcomes-trumps-support-constitution-gas-pipeline-2025-03-14/.

[45] EPA, *ICYMI: Administrator Zeldin in Boston Globe: Building the Constitution Pipeline is vital for New England's grid stability* (Aug. 6, 2025) (citing Lee Zeldin, *Building the Constitution Pipeline is vital for New England's grid stability*, Boston Globe (Aug. 5, 2025)), https://www.epa.gov/newsreleases/icymi-administrator-zeldin-boston-globe-building-constitution-pipeline-vital-new.

[46] Constitution Pipeline Co., LLC, Section 401 Water Quality Certification Request, DEC #0-999-00181/00029 (May 30, 2025). On the same date, Constitution filed a request for a Clean Water Act Section 404 Permit and a Rivers and Harbors Act Section 10 Permit with the U.S Army Corps of Engineers. *See* Constitution Pipeline Co., Clean Water Act Section 404 Permit and Rivers and Harbors Act Section 10 Permit, NAN-2012-0049-ULA (May 30, 2025).

rights that New York has waived its Section 401 authority under the Clean Water Act."[47] On November 7, 2025, Constitution withdrew its application for a water quality certification from NYSDEC.[48]

At the time Constitution originally filed its Certificate Application, it had executed long-term precedent agreements for the entire Project capacity.[49] Due to Constitution's halting of efforts to develop the Project in 2020, however, the precedent agreements were terminated. In 2025, Constitution recommenced discussions with shippers, and commissioned a market study to assess need for the Project.

### III.    THE NORTHEAST U.S. NEEDS CONSTITUTION

The Project represents a major step toward addressing the irrational situation in which, despite neighboring the Nation's most prolific, low-cost natural gas production area—the Marcellus Shale formation—homes and businesses in New York and New England pay the highest energy costs in the country and face significant reliability risks. Due to the lack of pipeline capacity into the region, electric generators in New England rely on the *import of LNG* from foreign nations, which comes at significant costs and carries reliability risks.[50] Numerous pipeline projects have been proposed to meet the

---

[47] *See* Attachment B, Constitution Pipeline Company, LLC, New York State Section 401 Water Quality Certification Request Cover Letter, n.1 (May 30, 2025).

[48] *See* Letter from Lynda Schubring, PMP, Manager Planning, Williams to Evan Hogan, New York State Department of Environmental Conservation (Nov. 7, 2025), https://dec.ny.gov/sites/default/files/2025-11/constitutionpl_nysdecwithdrawalletter.pdf

[49] Certificate Order, 149 FERC ¶ 61,199 at P 27.

[50] *See* Northeast Power Coordinating Council, *Northeast Gas/Electric System Study*, at 4 (Jan. 21, 2025) ("NPCC Study"), https://share.google/xbABQ8gYyGuyyuSjx. In fact, "[t]he record high global LNG prices that peaked following the Russian invasion of Ukraine corresponded to record high winter futures of New England indices." *Id*. at 15.

pricing and reliability challenges but failed due to the same political and regulatory challenges that hampered Constitution.[51]

Williams commissioned a market study from S&P Global to assess the need for and market impacts of a revitalized Constitution Pipeline Project (the "S&P Study"). As further discussed below, the S&P Study determined that peak demand in the Northeast will remain high for the next 15 years, making additional infrastructure projects key to utilities' reliability targets.[52] The S&P Study found that the Constitution Pipeline Project would increase deliverability of lower cost gas supply into constrained Northeast gas markets, alleviating a key winter bottleneck into New England.[53] Due to its direct access to supply and ability to reduce costs in Northeast gas and power markets, the Project is expected to achieve a higher utilization than other regional assets, including 85-90 percent throughput on peak days.[54] The Project will improve the efficiency, resiliency, and reliability of gas service and help to reduce gas prices in the Northeast, including during peak demand days.

## A.     The Project Will Deliver up to $8.5 Billion in Savings to Consumers During Its First 15 Years in Service

The Project will reduce gas and electric prices in the Northeast. Peak Northeast gas prices have averaged at least 2.5 times the national benchmark of Henry Hub's winter average over the past 15 years.[55] Price volatility is a particular challenge—due to lack of pipeline deliverability, regional prices often spike on peak winter days, such that prices

---

[51] In addition to the Constitution Pipeline Project, the National Fuel Gas Supply Corp. Northern Access project was cancelled in 2024 (Docket No. CP15-115-000), the PennEast Pipeline was cancelled in 2021 (Docket No. CP15-558-000), the Algonquin Gas Transmission Access Northeast Pipeline was cancelled in 2017 (Docket No. PF16-1-000), and the Tennessee Gas Pipeline Company Northeast Energy Direct Pipeline was cancelled in 2016 (Docket No. CP16-21-000).
[52] S&P Study at 3.
[53] *Id.* at 23.
[54] *Id.* at 24.
[55] *Id.* at 18.

14

may reach 36 times the average levels on a given day.[56] The S&P Study found that without additional natural gas infrastructure, "Northeast wholesale winter gas prices will remain high and prone to extremes, leaving end-users potentially exposed to high costs and volatility."[57]

This is consistent with assessments of both the Commission and ISO New England, which operates the region's six-state power grid. In its most recent State of the Markets Report, the Commission reported that all major natural gas trading hubs in the country saw price reductions last year, except for the major hubs in the Northeast.[58] Transco Zone 6 N.Y., which serves New York City, experienced a 14 percent increase in natural gas prices, and Algonquin Citygates, which serves the Boston area, experienced a three percent increase.[59] The Commission's recent Winter Energy Market and Electric Reliability Assessment shows that Algonquin City Gates "could see the highest prices in the county," this winter, as winter natural gas futures prices rose by $0.47/MMBtu over last year's average at the Boston area hub.[60] Similarly, Transco Zone 6, "may face supply constraints this year," as futures prices rose by $3.18/MMBtu over last year's average.[61] The higher price of natural gas is the primary reason that "ISO-NE has exhibited the highest energy prices in the Eastern Interconnect," according to ISO New England's 2024 Assessment of

---

[56] *Id.* at 12.
[57] *Id.* at 19.
[58] FERC, Staff Report, *2024 State of the Markets*, at 16-17 (Mar. 20, 2025), https://www.ferc.gov/media/state-markets-report-2024.
[59] *Id.*
[60] FERC, Staff Report, Winter Energy Market and Electric Reliability Assessment, at 15-16 (Nov. 20, 2025), https://www.ferc.gov/news-events/news/2025-2026-winter-energy-market-and-reliability-assessment.
[61] *Id.*

Electricity Markets.[62] ISO New England's 2024 Annual Markets Report also recognizes that its volatile winter pricing is driven by "regional pipeline constraints."[63]

Higher gas prices in the Northeast place upward pressure on costs of electricity in the region. Electric prices in New York are 1.4 times higher than those in Texas and 1.2 times higher than in the areas of the Mid-Atlantic and Midwest covered by PJM.[64] New England similarly faces electricity production costs that are 1.5 times higher than those in Texas and 1.3 times higher than PJM.[65]

The Project is anticipated to mitigate these costs, delivering net cost savings of up to $8.5 billion to consumers over a 15-year period, driven in large part by its mitigation of price spikes during peak days.[66] Even assuming no significant weather events occur (which is very unlikely), the Project will result in up to $2.6 billion in reduced wholesale gas and power prices.[67]

These cost savings are consistent with those of other assessments. Another recent study from S&P Global, led by Daniel Yergin, finds that the "huge resource base" of the Marcellus Shale "remains constrained by pipeline exit capacity to markets . . . as a result of the ongoing political and environmental opposition to building new interstate pipeline capacity in the US."[68] The study finds that expansions of pipeline infrastructure into the

---

[62] Potomac Economics, 2024 Assessment of the ISO New England Electricity Markets, at 2 (June 18, 2025) https://www.iso-ne.com/static-assets/documents/100025/iso-ne-2024-emm-report-final.pdf ("ISO-NE has exhibited the highest energy prices in the Eastern Interconnect, primarily due to higher natural gas prices at pipeline delivery locations in New England.").

[63] ISO New England, *2024 Annual Markets Report*, at 16 (May 23, 2025) https://www.iso-ne.com/static-assets/documents/100023/2024-annual-markets-report.pdf.

[64] Wood Mackenzie, North America Power Tool, Base Case 1H 2025 ($/Megawatt-hour ("MWh")).

[65] *Id.*

[66] S&P Study at 3. These savings account for Constitution's cost-of-service.

[67] *Id.* at 24, 27, 33.

[68] Daniel Yergin, Ph.D., *et al.*, *Major New US Industry at a Crossroads: A US LNG Impact Study – Phase 2*, S&P Global, at 27, 29 (Mar. 6, 2025) https://www.spglobal.com/en/research-insights/special-reports/major-

Northeast would lead to greater savings per household than any other area of the country.[69]

In fact, that study supports additions of 1.5 billion cubic feet per day of capacity into New York and New England—nearly 2.5 times that being proposed by Constitution.[70]

This echoes findings in the original certificate proceeding that the Project would deliver cost savings to American homes and businesses. As stated in the Project's Final EIS, the Project will "result[] in enhanced market competition, reduced price volatility, and lower prices."[71]

**B.      The Project Is Needed to Improve Reliability and Resilience of the Natural Gas and Electric Systems in the Northeast**

Grid operators in both New York and New England are warning that the lack of natural gas pipeline capacity into the regions presents significant reliability threats. New York will continue to rely significantly on natural gas-fired electric generation to meet growing demand for electricity because renewable resources do not have the necessary reliable resource capabilities.[72] The New York Independent System Operator's ("NYISO") states that demand for electricity is increasing due to electrification programs and new large-load customers such as data centers being used for artificial intelligence.[73] As a result, NYISO forecasts that demand could increase by an additional 1,600 megawatts ("MW")

---

new-us-industry-at-a-crossroads-us-lng-impact-study-phase-2#Unleashing (finding that in the Northeast, "pipeline expansions have the largest impact on wholesale gas prices").

[69] *See id.* at 28-29.

[70] *Id.* at 27-28.

[71] Final EIS at 2-35.

[72] New York Independent System Operator, Inc., *2025 Power Trends: the New York ISO Annual Grid and Markets Report*, at 13-14 (June 2, 2025) ("NYISO Market Report"), https://www.nyiso.com/documents/20142/2223020/2025-Power-Trends.pdf/51517a1b-36fa-4f3d-d44d-eabe23598514 (noting that "[w]hile all resources supplying the grid offer some of these capabilities, only New York's existing fossil resources and certain hydro generators deliver the full array of services needed to balance a dynamic grid.").

[73] *Id.* at 5.

by 2030,[74] and that winter demand is expected to grow by approximately 14,000 MW by the year 2040.[75] To meet growing demand, NYISO has called for construction of new dispatchable generation and repowering of existing natural gas plants.[76]

As electric demand increases, limits to natural gas deliverability present a growing risk to reliability, which is already under duress. NYISO made clear in its most recent state of the grid and markets report that "[r]eliability margins are declining," and that "[e]lectric system reliability in winter is an increasing concern."[77]

This challenge is particularly pressing during winter months, when the demand for natural gas is far higher across sectors, which limits the available fuel supply to natural gas-fired electric generators.[78] NYISO warns that "if gas-fired generators cannot secure fuel during peak winter demand periods, statewide deficiencies could arise as soon as winter 2029-2030[,]" and "[c]onsidering higher demand growth or extreme winter weather conditions, deficiencies may happen years earlier."[79]

Lack of pipeline capacity into the region is a major source of this threat. NYISO states that "pipeline constraints in the winter months" threaten electric reliability.[80] In its recent reliability needs assessment, NYISO identified strained gas supply as a growing risk to electric system reliability statewide.[81] As electric demand continues to grow, "the gas

---

[74] *Id.*

[75] *Id.* at 10.

[76] *Id.* at 8-14.

[77] NYISO Market Report at 7, 10.

[78] *Id.* at 22 ("As New York becomes a winter-peaking system, the gas supply to electric generation plants is expected to be strained. On the coldest days, the natural gas distribution companies must serve residential heating first and, when there is insufficient gas supply, limit the fuel available to generators without firm contracts. These coldest days also correspond to peak winter demand periods when the gas generation fleet is needed the most.").

[79] *Id.* at 11.

[80] *Id.* at 14.

[81] NYISO, 2024 Reliability Needs Assessment (Nov. 19, 2024), https://www.nyiso.com/documents/20142/2248793/2024-RNA-Report.pdf

18

supply to electric generation plants will be strained beyond what has been historically observed."[82]

The New England region faces similar challenges. As in New York, natural gas pipeline capacity in New England is seasonally full.[83] New York, Rhode Island, Connecticut, and Massachusetts clean energy electricity targets require dispatchable energy to stabilize the grid.[84] New Hampshire's power demand is set to surge 82 percent by 2050 from electrification alone. If 50 percent of that growth is met or backstopped by natural gas, that would require about 90 million cubic feet per day.[85]

As recently highlighted in a study from the Northeast Power Coordinating Council ("NPCC Study"), existing gas infrastructure in New England would be fully or near-fully utilized during a cold snap, presenting a significant threat to reliability.[86] Because very few electric generators hold firm transportation capacity, they face risks in the event of an extreme weather event or a pipeline outage.[87] ISO New England recently recognized this challenge, finding that "[k]ey drivers of growing winter risk include gas pipeline constraints that severely limit fuel available to the region's 9 [gigawatts] of gas-only generators in cold weather."[88] New England public utilities must depend on foreign

---

[82] *Id.* at 27 (Nov. 19, 2024).

[83] Northeast Gas Power Coordinating Council, *Northeast Gas/Electric System Study*, at 78 (January 2025), 678fee912264907c381a0f68_NPCC Northeast Gas Electric System Study.pdf; NERC, *Statement on NPCC Northeast Gas/Electric System Study* (Jan. 21, 2025), https://cdn.prod.website-files.com/67229043316834b1a60feba3/678fee912264907c381a0f68_NPCC Northeast Gas Electric System Study.pdf ("natural gas dependency in New England and New York poses a high risk for electric reliability during extreme winter weather under certain circumstances. The analysis confirms that the natural gas system is fully or near fully utilized during extreme weather conditions.").

[84] *Id.* at 79.

[85] Wood Mackenzie, North Americal Power Tool, Base Case 1H 2025.

[86] NPCC Study at 4-5 ("Hydraulic modeling confirms that the Study Region's natural gas infrastructure is fully or near fully utilized during the modeled extreme cold weather period.").

[87] *See id.* at 4.

[88] Potomac Economics, *2024 Assessment of the ISO New England Electricity Markets*, at xii n.3 (June 2025), https://www.iso-ne.com/static-assets/documents/100025/iso-ne-2024-emm-report-final.pdf.

supplies of LNG, which come at a premium price, to ensure reliability.[89] Summarizing the NPCC Study, the North American Electric Reliability Corporation ("NERC") stated that "the natural gas system is fully or near fully utilized during extreme conditions and reveals that certain contingencies, such as pipeline disruptions and protracted extreme weather, pose severe threats to reliability."[90]

Previous cold snaps in New England have exposed the region's fuel security issues. ISO New England reports that the region's fuel security risks have been evident since a 2004 cold snap.[91] During that freeze, more than 6,000 MW of natural gas-fired generation was unavailable, much of it due to lack of fuel, pushing the electricity system close to its limits.[92] These constraints have persisted, saddling the region with even greater risks as electric demand increases.[93]

The Project will address these reliability and national security issues by providing direct access to 650,000 Dth per day of firm pipeline capacity from the Nation's most prolific natural gas production area. As Constitution explained in its Certificate Application, "the Project will benefit the consuming public by increasing competition among fuel sources and increasing the security of their gas supplies."[94] In addition, as was recognized in the Project's Final EIS, the purpose of the Project is, and remains, to

---

[89] *See* NPCC Study at 4 ("The [LNG] importers to New England represent an integral part of gas-fired generators' ability to satisfy fuel assurance objectives.").

[90] NERC, *Statement on NPCC Northeast Gas/Electric System Study* (Jan. 21, 2025), https://www.nerc.com/news/Pages/Statement-on-NPCC-Northeast-GasElectric-System-Study.aspx.

[91] ISO New England Inc., *Operational Fuel Security Analysis*, at 10 (Jan. 17, 2018), https://www.iso-ne.com/static-assets/documents/2018/01/20180117_operational_fuel-security_analysis.pdf.

[92] *Id.* at 10, n.4.

[93] Potomac Economics, *2024 Assessment of the ISO New England Electricity Markets*, at xii n.3 (June 2025), https://www.iso-ne.com/static-assets/documents/100025/iso-ne-2024-emm-report-final.pdf.

[94] Certificate Application at 16.

"increase[e] supply diversity and improv[e] operational performance, system flexibility, and reliability in the New York and New England market areas."[95]

## C. The Project Would Supply Natural Gas to Electric Generators That Are Unable to Enter into Long-Term Agreements for Firm Capacity on Natural Gas Pipelines

Electric generators' needs for natural gas represent a major driver of need for the Project. Indeed, both New York and New England rely on natural gas-fired generators to meet about half of their electricity needs,[96] and natural gas prices drive wholesale power prices in both regions.[97] Despite the regions' dependence on natural gas for electricity and the substantial reliability concerns discussed above, electric generators do not typically enter into long-term contracts for natural gas pipeline capacity due to the design of deregulated electric markets, as found within New York and New England.[98] Thus, although the Project is intended in large part to support electric generators' needs for additional pipeline capacity, Constitution has not yet executed contracts with shippers committing to Project capacity, but intends to do so prior to the Commission's issuance of an order on this Petition.

This is largely the result of a mismatch between designs of the electric and natural gas pipeline markets. Gas-fired electric generators in the Northeast generally rely on price

---

[95] Final EIS at 1-2.

[96] Energy Information Admin., New York State Profile and Energy Estimates (last updated Jan. 16, 2025), https://www.eia.gov/state/analysis.php?sid=NY; Statement of Gordon van Welie, President and CEO, ISO New England, Federal and State Current Issues Collaborative, Docket No. AD24-7-000, at 5 (Apr. 25, 2025) ("ISO-NE Comments").

[97] S&P Study at 26 (explaining that "Gas is the marginal fuel >90% of the time in New England and ~80% in New York, making it the leading driver of regional wholesale power prices").

[98] *Engie Gas & LNG LLC v. Dep't of Pub. Utilities*, 475 Mass. 191, 194 (2016) ("[E]lectric generators that use natural gas to produce electricity are generally unwilling or unable to enter into long-term contracts to secure firm gas capacity. For these generators, there is added risk for such contracting because there is no means by which they can be reasonably assured of receiving enough revenue to cover the cost of securing the gas capacity over the course of each year.")

21

signals from short-term spot markets for electricity to determine how much natural gas they need to acquire to fuel their plants.[99] Due to this short-term market design, electric generators are unlikely to enter into long-term firm contracts for capacity on natural gas pipelines.[100] Interstate natural gas pipelines, on the other hand, typically are supported by long-term commitments from customers.

This mismatch has contributed to an underdevelopment of natural gas infrastructure, particularly in the Northeast, and the resulting high electricity prices and reliability concerns.[101] Last year, the Commission convened the Federal and State Current Issues Collaborative to, among other things, identify issues and explore solutions relating to electric reliability and natural gas-electric coordination.[102] During this proceeding, electric/natural gas utilities,[103] Regional Transmission Organizations/Independent System

---

[99] ISO-NE Comments at 6-7.

[100] *Id.*; *see also* Summary of Initial Remarks of Nancy Bagot of the Electric Power Supply Association, Federal and State Current Issues Collaborative, Docket No. AD24-7-000, at 4 (Apr. 25, 2025) ("EPSA Comments").

[101] *See id.* at 5-6 ("New England has long been challenged by . . . limited gas infrastructure to meet the combined peak demand from heating customers and power generation. This physical constraint drives up gas prices, forcing the region to rely on more expensive oil and [LNG]."); Post-Meeting Comments of National Grid USA, Federal and State Current Issues Collaborative, Docket No. AD24-7-000, at 6-7 (Jan. 3, 2025) ("National Grid Comments") ("Gas-fired generators often do not enter into [firm transportation] contracts. Without this assurance, however, gas supply arrangements easily can be subject to curtailment or interruption—particularly on the coldest days of the winter season—and the reliability and integrity of the gas system and the power grid may be compromised as a result. This underscores the importance of creating appropriate incentives for generators to enter into [firm transportation] arrangements with pipelines to shore up gas supplies.").

[102] *Joint Federal-State Task Force on Electric Transmission Federal and State Current Issues Collaborative*, 186 FERC ¶ 61,189 (2024), *modified*, 192 FERC ¶ 61,056 (2025).

[103] National Grid Comments at 2 ("[T]he Commission should promote creation of financial incentives and capacity market reforms to encourage gas generators to enter into seasonal or long-term contracts for firm access to reliable fuel sources and pipeline capacity."). *See id.* at 3 ("New England and New York lack adequate gas infrastructure to ensure the reliable operation of natural gas both for winter heating service and for electric generation needed to serve customers. . . . In the near term, without adequate infrastructure and until such time that additional resources are commercially operational, these problems likely will worsen as demand for natural gas for retail service and electric generation continues to increase . . . .").

22

Operators,[104] the North American Electric Reliability Coordinator,[105] power producer trade groups,[106] and interstate pipelines[107] all recognized that necessary natural gas infrastructure is not being developed because electric power producers do not have the proper market incentives to enter into long-term binding precedent agreements. To resolve this issue, many stakeholders not only asked the Commission to authorize the construction of new natural gas pipeline infrastructure,[108] but also to encourage efforts to create market incentives for natural gas-fired electric generators to enter into long-term firm contracts to support such construction.[109]

More recently, the National Association of Regulatory Utility Commissioners ("NARUC") issued a report culminating two years of studying gas-electric coordination challenges, in which it made several recommendations to ensure the safe, efficient, and reliable operation of the electric system.[110] As background, NARUC presented a "problem statement" that "[t]here is widespread recognition that the United States needs additional natural gas pipeline infrastructure to reliably meet the United States' growing and changing

[104] *See* ISO-NE Comments at 6-8.

[105] Comments of North American Electric Reliability Corporation for Second Meeting of Federal-State Current Issues Collaborative, Docket No. AD24-7-000, at 4 (Apr. 30, 2025) ("NERC Comments") ("For FERC, the key, near-term challenges will be to work with the market areas under their jurisdiction to ensure that market mechanisms provide adequate incentive and compensation to encourage and reward generators to enter into appropriate fuel supply arrangement in a manner consistent with the merchant business model. FERC will also be essential in granting permits for new natural gas pipeline and storage capacity which will undoubtedly be necessary as load grows.").

[106] EPSA Comments at 4 ("On the economics . . . the business models do not align in ways that are fundamental – power generators are unable to commit to a 10-year (much less a 20 or 30-year) contract to support the development of [new natural gas infrastructure]. . . . This requires difficult but important continued conversations regarding the financial approaches to supporting new infrastructure.").

[107] Reply Comments of the Interstate Natural Gas Association of America, Federal and State Current Issues Collaborative, Docket No. AD24-7-000, at 6 (Jan. 21, 2025).

[108] NERC Comments at 4 ("FERC will also be essential in granting permits for new natural gas pipeline and storage capacity which will undoubtedly be necessary as load grows.").

[109] *Id.*; *see also* NERC Comments at 4; *see also* National Grid Comments at 2.

[110] National Association of Regulatory Utility Commissioners Task Force on Gas-Electric Alignment for Reliability (GEAR), Report and Recommendations (Nov. 2025), https://pubs.naruc.org/pub/2527936B-BEB6-767B-50BE-01BEEEB3091F

demand for energy."[111] NARUC made several statements concerning the need for additional gas pipeline infrastructure, which apply most pointedly to the Northeast:[112]

- "There are substantial obstacles to expanding the interstate natural gas pipeline system to meet the recognized need for more infrastructure and will become more challenging due to growing electricity demand largely needing to be met with natural gas."

- "Constrained infrastructure also leads to higher natural gas and electricity prices in addition to reduced reliability."

- "Much of the natural gas pipeline system lacks sufficient available capacity to meet significant new demand from natural gas utilities and generators, especially on a firm basis, and the federal permitting process is an obstacle to expanding the system."

NARUC's chief recommendation in this area was to "support federal permitting reform that would address infrastructure hurdles in a meaningful way such that new infrastructure can be in place in a timely manner to meet growing and changing natural gas and electricity demand."[113]

These conclusions and recommendations, while expressed on a general level, support the need for projects just like the Constitution Pipeline Project, which will reduce energy prices and improve reliability. The Commission can take a meaningful step toward addressing these concerns by reissuing certificate authorization for the Project.

**D.** **The Project Would Facilitate Conversion from Heating Oil to Natural Gas for Heating, Thereby Reducing Emissions Intensity**

Due to the lack of adequate pipeline capacity, New England is the last region of the country that relies significantly on fuel oil for heating, resulting in unnecessary emissions from an outmoded form of heating. The S&P Study finds that by increasing deliverability

---

[111] *Id.* at 11-13.
[112] *Id.*
[113] *Id.* at 12.

of natural gas, the Project would facilitate conversions of homes and businesses from fuel oil to natural gas for heating.[114] Because the emissions intensity of natural gas is 28 percent lower than that of fuel oil, this would result in reduced emissions of pollutants and greenhouse gases.[115] Notably, increasing the natural gas share of residential and commercial demand by one percent in the relevant states would result in the avoidance of roughly 300,000 tons of carbon dioxide equivalents per year,[116] this amount is equivalent to removing about 70,000 passenger vehicles from the road.[117]

## IV.     THE PROJECT IS REQUIRED BY THE PUBLIC CONVENIENCE AND NECESSITY

The Project remains, as it was when the Commission approved it in the Certificate Order, required by the public convenience and necessity. The Commission has already examined the need for the Project, its effect on existing shippers, its effect on other pipelines and their captive customers, and landowners and surrounding communities, and found that the "the public convenience and necessity requires approval of the Project."[118] These findings remain equally applicable today.

Under the Commission's Certificate Policy Statement,[119] in deciding whether to authorize the new pipeline facilities, the Commission balances the project's benefits against its potential adverse consequences. The threshold requirement is that the pipeline must be prepared to support the project financially without relying on subsidization from existing

---

[114] S&P Study at 30.

[115] *Id*.

[116] *Id.*

[117] *Id.*; U.S. Environmental Protection Agency: Greenhouse Gas Equivalencies Calculator, https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

[118] *See* Certificate Order, 149 FERC ¶ 61,199 at PP 29, 24-29.

[119] *See* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (collectively, "Certificate Policy Statement").

customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved by the project against the residual adverse effects of the project. This is essentially an economic test. Only when the benefits of a project outweigh the adverse effects of the project on economic interests will the Commission proceed to complete an environmental analysis of the project, where other interests are considered.

As shown below, the Project continues to satisfy the Certificate Policy Statement and remains required by the public convenience and necessity.

## A.    The Project Satisfies the No-Subsidy Requirement

Since Constitution has no existing shippers, there is no risk of financial subsidies from existing shippers.[120] Therefore, the Project satisfies the Commission's threshold requirement under the Certificate Policy Statement that there be no subsidy from existing shippers.[121]

## B.    Constitution Has Limited or Minimized Potential Adverse Effects on Customers, Existing Pipelines, Landowners, and Other Stakeholders

The Commission found in the Certificate Order that the Project does not create any adverse impacts to existing customers because Constitution is a new pipeline company without existing customers. Likewise, there are no expected adverse impacts on other

---

[120] Certificate Order, 149 FERC ¶ 61,199 at P 24.
[121] *See id.*

existing pipelines or their captive customers. No pipelines objected to Constitution's original application and no pipelines are expected to object to Constitution's present petition.[122]

The Commission also found in the Certificate Order that Constitution has taken sufficient steps to mitigate any adverse impacts to landowners.[123] As explained in the Certificate Order, during the application process Constitution "made changes to over 50 percent of the proposed pipeline route in order to address concerns from landowners and to negotiate mutually acceptable easement agreements," and located the pipeline within or parallel to existing rights-of-way where feasible.[124] Constitution has not changed the route of the Project as it was originally certificated, with the exception of the limited variances in Pennsylvania that were approved by the Commission.[125] Accordingly, the benefits of the extensive rerouting that occurred over the course of the pre-filing and certificate proceedings remain.

At the time the Certificate Order was issued, the Commission determined that Constitution had taken sufficient steps to minimize adverse impacts on landowners, and rejected Project opponents' assertions that such steps were inadequate given that Constitution only had signed easements with approximately 50 percent of landowners.[126] After issuance of the Certificate Order, Constitution obtained additional land rights. Currently, Constitution or its affiliates hold necessary easements for approximately 109 miles of the 125 miles—approximately 87 percent—of the pipeline route.

---

[122] *See id*. P 25.
[123] *Id.* P 26.
[124] *Id.*
[125] *See* 2016 Letter Order.
[126] Rehearing Order, 154 FERC ¶ 61,046 at P 23.

In addition to its efforts to minimize impacts to landowners, Constitution engaged with communities and stakeholders to communicate project information, promote awareness of the federal and state permitting schedules, and provide training to first responders. As part of its outreach, Constitution executed a significant community grant program, providing approximately $1.9 million to support community projects and first responders. Constitution commits to continue its outreach to landowners and stakeholders and will continue to support community initiatives and local non-profit organizations during the life of the project.

## C.    The Public Benefits of the Project Outweigh Any Potential Adverse Effects

Given the Northeast's pressing need for natural gas pipeline infrastructure and Constitution's mitigation of any impacts on landowners and communities, the Project's benefits outweigh any adverse impacts. The Commission has already made this determination and upheld it on rehearing.[127]

The need for the Project is even more pressing today than it was when the Commission issued the Certificate Order. Since that time, energy prices in the Northeast have remained stubbornly out-of-step, averaging at least 2.5 times the rest of the country's on peak days.[128] To address this disparity, President Trump issued an Executive Order on his first day in office expressing concern with "inadequate development" of pipeline infrastructure in the Northeast, and directing agencies to use all "authorities available to them to facilitate the . . . transportation of energy . . . in and through . . . the Northeast."[129] Executive Order No. 14,156 declares this problem "most pronounced in our Nation's

---

[127] Certificate Order, 149 FERC ¶ 61,199 at P 29; Rehearing Order, 154 FERC ¶ 61,046 at PP 18-23.
[128] S&P Study at 3, 17.
[129] Exec. Order No. 14,156 § 3(b), 90 Fed. Reg. at 8434.

Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[130] These concerns are laser-focused on facilities like the Constitution Pipeline Project, which, notwithstanding that it will save homes and businesses up to $8.5 billion over 15 years and ameliorate significant reliability concerns,[131] was halted by "dangerous State and local policies." The Commission should adhere to the Administration's directive and ensure that the Project is not halted a second time.

Although Constitution has not yet executed contracts to replace the original precedent agreements for the Project that were terminated when Constitution allowed its certificate authorization to lapse in 2020, Constitution fully expects that the need for the Project will manifest itself in the form of binding contracts for the Project capacity. And, in that regard, Constitution intends to execute contracts for the Project capacity and file the same with the Commission prior to the issuance by the Commission of an order on this Petition.

In any event, under the circumstances presented here the Commission has ample evidence on which to determine that the Project's benefits outweigh its impacts, even without precedent agreements. While prior to issuance of the Certificate Policy Statement the Commission had in most cases required certificate applicants to demonstrate market support through contractual commitments of at least 25 percent of project capacity, the Commission eliminated that requirement in the Certificate Policy Statement.[132] The

---

[130] *Id.* § 1, 90 Fed. Reg. at 8434.

[131] *See* NYISO Market Report at 14 (stating that "pipeline constraints in the winter months" threaten electric reliability).

[132] Certificate Policy Statement, 88 FERC at 61,743 (discussing past policy).

29

Commission declared that it "will no longer require an applicant to present contracts for any specific percentage of the new capacity."[133] Instead, the Commission stated that it will consider "all relevant factors reflecting the need for the project," which could include, but would not be limited to, "demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market."[134] The Commission explained that this policy would allow it to consider broader benefits of new pipeline capacity, which "could include, among other things, meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives."[135]

The Project provides many of the benefits discussed in the Certificate Policy Statement. The Project will "meet unserved demand" by providing additional pipeline capacity in the most pipeline-constrained area of the country, allowing utilities and electric generators (that do not traditionally sign up for pipeline capacity) to utilize the pipeline capacity and serve their needs.[136] The Project will "eliminate bottlenecks" that prevent abundant low-cost Marcellus Shale production from reaching the enormous demand centers of the Northeast, where gas is the most expensive in the Nation.[137] As such, the

---

[133] *Id.* at 61,748.

[134] *Id.* at 61,747.

[135] Certificate Policy Statement, 90 FERC at 61,396.

[136] NPCC Study at 1 ("Generators do not typically hold firm transportation entitlements, relying instead on contracting for transportation with third parties who do hold firm rights or utilizing non-firm capacity that is available after firm customers' gas has been scheduled.").

[137] Certificate Policy Statement, 90 FERC at 61,396. *See, e.g.*, *NEXUS Gas Transmission LLC*, 172 FERC ¶ 61,199, at P 25 (2020) (issuing certificate and finding "the NEXUS project will help to alleviate a bottleneck of available capacity for transporting gas from the Marcellus and Utica production regions to markets currently sourcing higher priced gas"), *reh'g denied*, 174 FERC ¶ 62,068 (2021), *pet. for review denied*, *City of Oberlin, Ohio v. FERC*, 39 F.4th 719, 729 (D.C. Cir. 2022) ("Specifically, FERC found that the Nexus

Project will provide homes and businesses in the Northeast with "access to new supplies."[138] The Project will provide "lower costs to consumers" to the tune of up to $2.6 billion over 15 years assuming there are no extreme weather events, and assuming extreme weather continues at the pace it has over the past 15 years, would save consumers up to $8.5 billion.[139] The Project will provide "new interconnects that improve the interstate grid" by connecting to Iroquois' Wright Interconnect Project, which will enable delivery of incremental natural gas supplies into the systems of Iroquois and Tennessee.[140] It will "increase[e] electric reliability" by delivering additional natural gas into the Northeast, where both NYISO and ISO New England express increasing concerns over regional electric reliability.[141] And it will "advance[] clean air objectives" by helping New England, the last region of the country with significant reliance on fuel oil for heating, transition away from fuel oil to natural gas, which would reduce emissions intensity by 28 percent.[142]

---

Project was needed to alleviate a bottleneck in the capacity to transport gas from the Appalachian Basin and to increase supply to Midwestern markets.").

[138] *See* Certificate Policy Statement, 90 FERC at 61,396. *See, e.g.*, *PennEast Pipeline Co.*, 162 FERC ¶ 61,053, at PP 28, 30 (determining that end users would benefit from project because it would connect supplies from Marcellus Shale region to markets in Pennsylvania and New Jersey), *order on reh'g*, 164 FERC ¶ 61,098 (2018), *extension order*, 170 FERC ¶ 61,138 (2020), *order vacating authorizations*, 177 FERC ¶ 61,197 (2021); *Transwestern Pipeline Co.*, 121 FERC ¶ 61,175, at P 3 (2007) ("Granting the requested authorizations should permit additional, competitively-priced gas supplies to reach a rapidly growing region"); *reh'g denied*, 122 FERC ¶ 61,165 (2008).

[139] S&P Study at 24, 27, 33. *See* Certificate Policy Statement, 90 FERC at 61,396. *See, e.g.*, *Spire STL Pipeline LLC*, 181 FERC ¶ 61,232, at P 37 (2022) (public need supported by pipeline's showing that it reduced its project shipper's costs of delivered gas); *reh'g denied*, 183 FERC ¶ 61,048 (2023).

[140] Certificate Policy Statement, 90 FERC at 61,396. *PennEast Pipeline*, 162 FERC ¶ 61,053 at P 28 (determining that end users would benefit from project's construction because it would enhance the pipeline grid by providing additional transportation capacity from gas sources to markets in Pennsylvania and New Jersey).

[141] Certificate Policy Statement, 90 FERC at 61,396. *See, e.g.*, *Tractebel Calypso Pipeline, LLC*, 103 FERC ¶ 61,106, at P 25 (approving new pipeline in part because it would increase electric reliability by securing baseload supplies for fuel for both new and existing power generation); *order granting certificate*, 106 FERC ¶ 61,273 (2004).

[142] Certificate Policy Statement, 90 FERC at 61,396. *See, e.g.*, *Saltville Gas Storage Co.*, 107 FERC ¶ 61,267, at P 21 (gas storage project would provide public benefits by improving air quality through increasing the use of clean-burning natural gas for electric generation); *reh'g granted in part* 109 FERC ¶ 61,200 (2004);

It also bears noting that under its prior "optional certificate program," the Commission's practice was to permit applicants to seek certificates on an expedited basis even "without any market showing at all" provided they were willing to take on all economic risk associated with the projects.[143] The Commission reasoned that this policy would give "pipelines the ability to offer new service and construct facilities on a timely basis,"[144] and the D.C. Circuit upheld the Commission's application of this policy.[145] The Commission approved numerous pipelines under the optional certificate program without requiring submission of any precedent agreements, based on broader policy intended to expedite the development of new projects.[146] Thus, an examination of past practice shows

---

[143] Certificate Policy Statement, 88 FERC at 61,743 (discussing past policy). *See, e.g.*, *Mojave Pipeline Co.*, 69 FERC ¶ 61,244, at 61,921 (1994) ("Under the optional certificate regulations, the Commission is not required to examine the market need for a project."), *order vacating prior orders*, 75 FERC ¶ 61,108 (1996).

*clarification granted*, 110 FERC ¶ 61,318 (2005). *See also* S&P Study at 30 ("Constitution would increase supply deliverability and could facilitate [residential and commercial] switching from heating oil to natural gas, which has a 28% lower combustion emission intensity").

[144] *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 436, 1982–1985 FERC Stats. & Regs., Regs. Preambles ¶ 30,665, at 31,569, *order on reh'g and clarification*, Order No. 436-A, 1982–1985 FERC Stats. & Regs., Regs. Preambles ¶ 30,675 (1985), *order on reh'g*, Order No. 436-B, 1986–1990 FERC Stats. & Regs., Regs. Preambles ¶ 30,688, *order denying reh'g*, Order No. 436-C, 34 FERC ¶ 61,404, *order denying applications for reh'g*, Order No. 436-D, 34 FERC ¶ 61,405, *reconsideration denied*, Order No. 436-E, 34 FERC ¶ 61,403 (1986), *subsequent appeal*, *Associated Gas Distribs. v. FERC*, 824 F.2d 981 (D.C. Cir. 1987).

[145] *Pub. Util. Com'n of State of Cal. v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990).

[146] Certificate Policy Statement, 88 FERC at 61,743. *See, e.g.*, *Mojave Pipeline Co.*, 47 FERC ¶ 61,200, at 61,695 (1989) (certificate approving 383 miles of pipeline and denying protestor's request that the Commission "condition any authorization granted to Mojave to require Mojave to demonstrate a minimum level of firm contracts with nonaffiliated shippers before it can proceed") (subsequent history omitted); *Mojave Pipeline Co.*, 46 FERC ¶ 61,311, at 61,932-33 (1989) (holding that it was not arbitrary for the Commission to decline "to condition WyCal's optional certificate to require WyCal to submit long-term firm transportation service agreements executed with non-affiliated shippers [] before it can begin construction of its project or exercise the powers of eminent domain") (internal quotation mark omitted; subsequent history omitted); *Gateway Pipeline Co.*, 55 FERC ¶ 61,488 (1991) (issuing certificate without discussion of contracts for capacity), *order on reh'g*, 62 FERC ¶ 61,213 (1993); *Altamont Gas Transmission Co.*, 54 FERC ¶ 61,028, at 61,068 (1991) (certificate order not quantifying existing contracts or discussing them in the context of market demand); *Wyoming-California Pipeline Co.*, 44 FERC ¶ 61,001, at 61,002 (after noting that the pipeline company "has no contracts with any party to provide a firm or interruptible transportation service and none of its capacity has been committed at this time," granting preliminary determination on environmental issues advancing the project), *reh'g granted in part*, 45 FERC ¶ 61,234 (1988), *reh'g denied*, 46 FERC ¶ 61,310 (1989), *order issuing certificate*, 50 FERC ¶ 61,070, at 61,178 (1990) (granting certificate authorization without discussion or requirement of precedent agreements or market need).

that the Commission can approve projects without relying on precedent agreements, and in this case, where Constitution has demonstrated that its Project will address a national energy emergency and save consumers billions of dollars in energy costs, the Commission should find the Project in the public interest.

While the Project's benefits have become even more apparent since the Certificate Order was issued, its adverse impacts have lessened. Constitution has secured far more of the land rights needed for the Project, having increased from 50 percent at the time the Certificate Order was issued to nearly 89 percent today. As such, there are fewer adverse impacts to landowners today than there were when the Commission approved the Project previously.

The absence of executed precedent agreements as part of this Petition does not tip the balance of interests against approval of the authorizations requested herein. This proceeding is not analogous to *Jordan Cove* or *Turtle Bayou*, two other instances in which the Commission rejected certificate applications of project developers that lacked up-front customer commitments.[147] The developers in those cases had not submitted any market studies supporting the need for either of their projects and would be relying almost entirely on eminent domain to obtain land rights. In *Jordan Cove*, the developer of a 232-mile pipeline had failed "to make any significant showing of demand" even after the Commission issued four data requests over 3.5 years, and had obtained easements for only five percent of the permanent rights-of-way needed for the Project.[148] Likewise, in *Turtle Bayou*, the applicant presented no precedent agreements or market studies, instead relying

---

[147] *Jordan Cove Energy Project, L.P.*, 154 FERC ¶ 61,190, *reh'g denied*, 157 FERC ¶ 61,194 (2016); *Turtle Bayou Gas Storage Co.*, 135 FERC ¶ 61,233, *reh'g rejected*, 136 FERC ¶ 61,052 (2011), *reconsideration denied*, 139 FERC ¶ 61,033 (2012).
[148] *Jordan Cove*, 157 FERC ¶ 61,190 at PP 33, 35-36.

solely on general assessments that need for storage capacity was growing, and would have needed to "obtain virtually all of the property rights needed for the project from a few unwilling landowners."[149]

Constitution is unlike *Jordan Cove* or *Turtle Bayou*, as its market study shows that the Project will provide cost savings to consumers, and as shown in recent reports from grid operators, NARUC, NERC, and Executive Orders from the President, the Project is urgently needed to improve reliability. Furthermore, in contrast to the developers in *Jordan Cove* and *Turtle Bayou*, Constitution has secured the vast majority of land rights needed for the Project.

Nevertheless, Constitution recognizes the importance of precedent agreements and as indicated above, intends to file executed firm contracts prior to the Commission's issuance of an order in this proceeding. And, of course, the Commission can require—as it does in most certificate orders—that Constitution execute firm contracts with customers prior to commencing construction.[150] This is a standard requirement that requires subscription to a substantial amount of a project's capacity, which Constitution expects would be included in a reissued certificate order for the Project.[151] Accordingly, the Commission should conclude, as it did when it previously approved the Project, that "the Constitution Pipeline Project is required by the public convenience and necessity."[152]

---

[149] *Turtle Bayou*, 135 FERC ¶ 61,233 at P 33; *see also* 139 FERC ¶ 61,033 at P 15.

[150] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 192 FERC ¶ 61,184, at ordering para. (B)(4) (2025) (in the order reissuing certificate, including condition that Transco file "a written statement affirming that it has executed firm service agreements for volumes and service terms equivalent to those in its precedent agreements, prior to commencing construction").

[151] *See NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022, at ordering para. (B)(4) (2017) (requiring NEXUS to execute firm contracts, which constituted 59 percent of the project capacity, prior to commencing construction); *Midship Pipeline Co., LLC*, 164 FERC ¶ 61,103, at P 12 and ordering para. (B)(4) (2018) (requiring Midship to execute firm contracts constituting 64 percent of the project capacity prior to commencing construction).

[152] Rehearing Order, 154 FERC ¶ 61,046 at PP 18, 23.

## V.  REQUEST FOR REAFFIRMANCE OF WAIVER UNDER SECTION 401 OF THE CLEAN WATER ACT

Constitution requests that the Commission reaffirm its earlier finding that NYSDEC waived its opportunity to issue a certification under CWA section 401 for the New York State portion of the Project by failing or refusing to act on Constitution's request for a water quality certification within one year.

In 2019, the Commission determined that NYSDEC waived its authority to issue a water quality certification for the Constitution Pipeline Project. The Commission determined in the 401 Waiver Order that the coordinated withdrawal-resubmission process NYSDEC used in evaluating the Constitution Pipeline Project was "equivalent" to the one struck down by the D.C. Circuit in *Hoopa Valley*.[153] In reaching this determination, the Commission highlighted that like *Hoopa Valley*, NYSDEC actively induced Constitution to repeatedly withdraw and resubmit its application in response to NYSDEC's apparent need for additional time to review the application.[154] The Commission pointed out that although NYSDEC implied that Constitution's application "would most likely be denied" if it had not participated in the scheme, there is no record evidence this representation was conveyed to Constitution.[155] Constitution, therefore, withdrew and resubmitted its application in good faith based on the representations and requests of the state, mirroring the situation in *Hoopa Valley*.[156]

---

[153] 401 Waiver Order, 168 FERC ¶ 61,129 at P 42.

[154] *Id.* PP 32-34.

[155] *See id.* P 33. *See also, Village of Morrisville, Vt. v. FERC*, 136 F.4th 1117, 1127-28 (D.C. Cir. 2025) (holding that an applicant's unilateral decision to voluntarily withdraw and submit an application to address a state's requests for information did not constitute waiver of section 401).

[156] *Id.* P 42. The Commission explicitly stated that the record demonstrates that Constitution withdrew and resubmitted its application to grant the NYSDEC more time to review the application, and that NYSDEC itself publicly acknowledged this fact. *Id.* P 34.

The Commission also rejected arguments from NYSDEC attempting to distinguish *Hoopa Valley* on the grounds that: 1) NYSDEC and Constitution did not have a formal withdrawal and resubmission scheme;[157] and 2) that Constitution's resubmissions constituted new applications under CWA section 401.[158] The Commission determined that the holding in *Hoopa Valley* was not restricted only to formal agreements between the state and the applicant, but rather extended to any functional agreement that circumvented FERC's authority over when a federal license will issue.[159] The Commission also noted that it did not need to consider whether subsequent resubmissions are new applications because the record demonstrated that NYSDEC itself did not treat Constitution's resubmissions as new applications.[160]

After reaching the conclusion that NYSDEC had operated an equivalent scheme to the one in *Hoopa Valley*, the Commission, therefore, found that the "[NYSDEC's] inaction pursuant to its functional agreement with Constitution beyond one year from the receipt of Constitution's first resubmission on May 9, 2014, constituted a failure or refusal to act within the plain meaning of those phrases in section 401."[161] "As a result," the Commission concluded, "[NYSDEC] waived its section 401 authority with regard to the Constitution Pipeline Project."[162]

The 401 Waiver Order was challenged in the Second Circuit, but while that case was pending, Constitution announced that it was no longer developing the Project. Because

---

[157] 401 Waiver Order, 168 FERC ¶ 61,129 at P 34.
[158] *Id.* PP 38-39.
[159] *Id.* P 34 (citing *Hoopa Valley*, 913 F.3d at 1104).
[160] *Id.* PP 38-39 (noting that NYSDEC treated public comments submitted prior to Constitution's revised application as still valid and that NYSDEC coordinated with Constitution to file perfunctory two-page letters withdrawing and resubmitting its application).
[161] *Id.* P 40.
[162] *Id.*

Constitution made such announcement, the Second Circuit dismissed the appeals as moot.[163] Consistent with its standard practice, the Second Circuit panel vacated the 401 Waiver Order solely on procedural grounds.[164] The court made no findings on the merits and, following the court order, the Commission took no additional action with respect to the 401 Waiver Order.

Subsequent decisions further demonstrate the validity of the 401 Waiver Order. The D.C. Circuit and the Commission have recognized a distinction between a "coordinated" scheme, as occurred in *Hoopa Valley* and this proceeding, and "unilateral" withdrawal-and-resubmission by the project applicant.[165] In *Village of Morrisville*, for example, the D.C. Circuit held that a state does not waive its statutory certificate authority when an applicant unilaterally withdraws and resubmits its application in an attempt to improve its negotiating ability with the state.[166] Instead, the D.C. Circuit noted that "evidence of the State's decision to delay was central to our holding in *Hoopa Valley*."[167] The D.C. Circuit has also held that a state does not waive its statutory certificate authority if record evidence demonstrates that it merely acquiesced to an applicant's decision to withdraw and resubmit its application.[168] In *Nevada Irrigation District*, the D.C. Circuit explained that the Commission must have evidence of an agreement to circumvent the statutory deadline and delay certification.[169]

---

[163] Motion Order, New York State Department of Environmental Conservation v. FERC, Nos. 19-4338, *et al.* (2d Cir. Nov. 18, 2021), ECF No. 161.

[164] *Id.*

[165] *See Cal. State Water Res. Control Bd. v. FERC*, 43 F.4th 920, 931-32 (D.C. Cir. 2022). The Commission has further held that denial of an application constitutes action satisfying section 401's requirements, and repeated denials of an application do not constitute a coordinated scheme. *See Turlock Irrigation Dist.*, 175 FERC ¶ 61,144 (2021).

[166] *Village of Morrisville, Vt.*, 136 F.4th at 1127-28.

[167] *Id.* at 1127.

[168] *Cal. State Water Res. Control Bd.*, 43 F.4th at 932-33.

[169] *Nev. Irrigation Dist. v. FERC*, 2025 WL 1905118, 4-5 (D.C. Cir. 2025).

While those decisions have limited the holding of *Hoopa Valley*, none of them are applicable to the Commission's determination in the 401 Waiver Order. Here, like in *Hoopa Valley*, Constitution's withdrawals and resubmissions of its application were done at NYSDEC's behest, and were not performed unilaterally by Constitution.[170] The 401 Waiver Order properly recognizes that NYSDEC's own statements provided record evidence of a coordinated scheme in which NYSDEC requested that Constitution withdraw its application in order to provide NYSDEC with time beyond the statutory deadline.[171] These statements demonstrate that, unlike in *Nevada Irrigation District* or other cases, NYSDEC orchestrated a withdrawal and resubmission scheme intended to circumvent section 401's statutory timeline.[172] The Commission's holding that NYSDEC's practice was "equivalent to the situation in *Hoopa Valley*"[173] is still valid. Because NYSDEC failed to act on Constitution's request for certification within one year, NYSDEC waived its authority under CWA section 401.

In this Petition, Constitution is asking the Commission to reissue certificate authority for the Project. Constitution has not changed and has not proposed any changes to the Project in New York that were also not submitted for review to NYSDEC during its CWA section 401 water quality certification review. Therefore, along with reissuing the same certificate authority that it previously issued, Constitution requests that the Commission affirm that its prior determination—"[NYSDEC] waived its section 401

---

[170] 401 Waiver Order, 168 FERC ¶ 61,129 at P 34.

[171] *Id.* The Commission does not require evidence of a formal agreement between the state and the applicant to support a finding of waiver but has instead held that record evidence must demonstrate coordination between these parties to circumvent section 401. *See, e.g., Pac. Gas & Elec. Co.*, 172 FERC ¶ 61,064, at P 26 (2020).

[172] *N.Y. Dep't of Env't Conservation,* 991 F.3d 439, at 449-50 (2nd Cir. 2021). Furthermore, NYSDEC did not deny or otherwise take action on Constitution's application in a manner satisfying section 401's requirements. *See Turlock Irrigation Dist.*, 175 FERC ¶ 61,144.

[173] 401 Waiver Order 168 FERC ¶ 61,129 at P 42.

authority with regard to the Constitution Pipeline Project"—continues to apply to the Project today.[174]

## VI. RATES AND TARIFF

Constitution requests that the Commission approve the same *pro forma* tariff that was approved in the Certificate Order. Prior to filing the tariff with the Commission, Constitution will make the necessary revisions to reflect changes that have occurred since the Certificate Order was issued, including changes required in the Certificate Order and updates to the North American Energy Standards Board standards.[175] In addition, Constitution intends to update the cost of facilities and recourse rates for the Project following Iroquois' filing of its petition for reissuance of the certificate approving the Wright Interconnect Project.

## VII. ENVIRONMENTAL IMPACTS

Constitution is proposing to construct and operate the same Project facilities that the Commission previously authorized including the variances to the Project route in Pennsylvania that were approved by the Commission after the Certificate Order was issued. Constitution incorporates by reference those variances into this Petition.[176] In addition, Constitution is providing an Environmental Consistency Summary, which demonstrates that the Project remains consistent with the Major Conclusions documented in the Commission's Final Environmental Impact Statement for the Project. The Environmental Consistency Summary verifies that the Project aligns with prior environmental analysis

---

[174] *Id.* P 40.
[175] Certificate Order, 149 FERC ¶ 61,199 at PP 54-63.
[176] *See* Letter Order, Constitution Pipeline Company, LLC, Docket No. CP13-499-000 (Jan. 29, 2016).

and that any observed changes are minor and do not significantly affect the human environment. Constitution continues to review the details related to environmental impacts that may have changed since the issuance of the Certificate Order and will supplement the record as necessary. Please note, too, that Constitution is working with the relevant permitting agencies to obtain the applicable federal permits and authorizations required in connection with the Project.

Constitution also notes that the Project will be able to deliver "NextGen Gas" into Northeast markets. NextGen Gas is tracked from the wellhead-to-the-delivery point and this pathway is among the lowest carbon-intensive natural gas found anywhere in the world. Constitution's owner and operator, Williams, follows a strict certification process for these natural gas deliveries through implementation of its NextGen Gas program. Williams' NextGen Gas program is an industry leading measurement-based quantification, monitoring, reporting, and verification program that certifies greenhouse emissions associated with the transportation and delivery of natural gas across Williams' assets. Through partnership with a climate tech company called Context Labs, Williams collects and correlates data from multiple disparate sources, including satellites, planes, real-time ground-based monitoring devices, direct source-level measurement, and live operational data to provide the most reliable and comprehensive quantification of its natural gas supply chain emissions. Williams' NextGen Gas program offers real-time tracking of greenhouse gas emissions intensity (on both methane and carbon intensity basis) with the low emissions attributes of transported and delivered natural gas represented by a verified certificate, with independent attestation by KPMG. Williams' NextGen Gas program was designed to improve trust and transparency in emissions detection, quantification, and

reporting and to further enhance operational excellence by helping identify opportunities for Williams to continue to reduce emissions. Williams is currently the only large-scale U.S. natural gas midstream company to have joined the internationally recognized Oil & Gas Methane Partnership ("OGMP") 2.0 and its NextGen Gas program has been recognized as a Gold Standard compliant pathway to achieving the Level 5 reporting standard, the highest standard of reporting under the OGMP 2.0 framework.

## VIII. LANDOWNER NOTIFICATION

With the Commission-approved variances described above, the Project has not changed since the issuance of the Certificate Order. Constitution will provide notice to affected landowners consistent with the landowner notification requirements that apply to certificate applications.[177] Constitution has attached an appropriate Form of Notice of Petition (Attachment C, hereto) for the Commission's convenience.

## IX. TIMING FOR REISSUANCES

Constitution requests the Commission expeditiously issue an order reissuing the certificate for the Project so that Constitution can complete construction of the Project facilities and place the Project in service by May 2028.[178] Constitution also requests the Commission reaffirm that NYSDEC waived its authority under Section 401 of the CWA for failing or refusing to act on Constitution's certification request within one year.

---

[177] 18 C.F.R. § 157.6(d).
[178] To meet this expedited schedule, Constitution requests waiver of a hearing under Rule 801 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.801, and waiver of any other requirements that may facilitate this request.

## X.   OTHER AUTHORIZATIONS

Aside from this Petition, Constitution is not aware of any other application to supplement or effectuate the proposal set forth herein which must be or is to be filed by it, by any of its customers, or any other person with any other federal, state, or other regulatory body.

## XI.   EXHIBITS AND ATTACHMENTS

Constitution incorporates by reference the exhibits from the original Certificate Application and the entire record of the Project in Docket Nos. CP13-499 and CP18-5. As part of this petition the following attachments are being included herein.

Attachment A – S&P Global, *Constitution Pipeline Market Impact Report* (Nov. 2025)

Attachment B – New York State Section 401 Water Quality Certification Request Cover Letter (May 30, 2025)

Attachment C – Form of Notice

Attachment D – Flow Diagram (updated Exhibit G and Exhibit G-II)

Attachment E – Updated Landowner List

Attachment F – Alignment Sheets

Attachment G – Split Aerial Alignment Comparison

Attachment H – Permit Table

Attachment I – Environmental Consistency Summary

## XII. CONCLUSION

WHEREFORE, Constitution respectfully requests:

1. That the Commission issue an order reissuing the certificate of public convenience and necessity for the Project;

2. That the Commission reaffirm that NYSDEC has waived its authority under Section 401 of the CWA;

3. That this Petition be processed in accordance with the shortened procedures set forth in Rules 801 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.801, and, in connection therewith, Constitution waives oral hearing and the opportunity for filing exceptions to the decision of the Commission, and that the Commission issue the Form of Notice of Petition attached hereto; and

4. That the Commission grant such other and further relief as may be proper and appropriate.

Respectfully submitted,

CONSTITUTION PIPELINE COMPANY, LLC

By */s/ Stephen A. Hatridge*
Stephen A. Hatridge
Vice President & Assistant General Counsel
Constitution Pipeline Company, LLC

43

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Federal Energy Regulatory Commission in this proceeding.

Dated at Houston, TX this 19th day of December 2025.

*/s/ Stephen A. Hatridge*
Stephen A. Hatridge
Vice President & Assistant General Counsel
Constitution Pipeline Company, LLC

# ATTACHMENT D

# Constitution Pipeline Petition – Attachment H

**ATTACHMENT H**

**Permits and Authorizations**

**Status of Permits and Approvals for the Constitution Pipeline**

| Agency | Permit/Approval | Status |
|---|---|---|
| **FEDERAL** | | |
| Federal Energy Regulatory Commission (FERC) | Certificate of Public Convenience and Necessity | December 2025 – This filing, Constitution petitions for reissuance of Certificate |
| U.S. Army Corps of Engineers (USACE) | Clean Water Act Section 404 Permit / Rivers and Harbors Act Section 10 Permit | May 30, 2025 – Constitution re-filed 404 applications |
| U.S. Fish & Wildlife Service (USFWS) | Threatened and Endangered Species; Migratory Bird Treaty Act; and Bald and Golden Eagle Protection Act Consultations | July 22, 2025 – Constitution re-initiated consultation with USFWS |
| **Interstate Commission** | | |
| Susquehanna River Basin Commission (SRBC) | Surface Water Withdrawal | 3rd Quarter 2026 – Resubmit applications |
| **Pennsylvania** | | |
| Pennsylvania Department of Environmental Protection (PADEP) | Clean Water Act Section 401 Water Quality Certificate | September 5, 2014 – 401 Water Quality Certification received |
| | PA Code Chapter 105 Water Obstruction and Encroachment Permit | 3rd Quarter 2026 – resubmit applications in 3Q 2026, following verification surveys. |
| | PA Code Chapter 102 Erosion & Sediment Control Permit | 3rd Quarter 2026 – resubmit applications in 3Q 2026, following verification surveys. |
| | CWA Section 402 NPDES – Hydrostatic Test Water Discharge General Permit 10 | 3rd Quarter 2026 – resubmit applications in 3Q 2026, following verification surveys. |
| PA Fish and Boat (PAFBC) | Permit for Use of Explosives | 3rd Quarter 2026 – resubmit applications |

| Agency | Permit/Approval | Status |
|---|---|---|
| PA Historic and Museum Commission (PHMC) | Section 106 | July 29, 2025 - Constitution re-engages PHMC<br><br>August 27, 2025 - PHMC agrees to extension of PA and continued coordination with cooperating parties and evaluation of James Newton Farm.<br><br>Constitution to coordinate with FERC and SHPOs to reinstate or update the Programmatic Agreement. |
| PA Game Commission (PAGC), PA Department of Conservation and Natural Resources (PADCNR) | State Threatened and Endangered Species | June 27, 2025 - Constitution re-initiates consultation with PADCNR and PAGC<br>July 1, 2025 - PADCNR confirmed no changes<br>Constitution will continue coordination |
| **NEW YORK** | | |
| NY State Department of Environmental Conservation (NYSDEC) | 401 WQC | Waived |
| NYSDEC | Article 15 and Article 24 | Withdrawn |
| NYSDEC | Title 33, Water Withdrawal | Withdrawn |
| NYSDEC | SPDES General Permit | Exempt under CWA 402(1)(2) |
| Office of Parks and Recreation Historic Preservation (OPRHP) | Section 106 | July 29, 2025 - Constitution re-engages OPRHP<br><br>August 15, 2025 – OPRHP confirms no change in resource status since coordination ceased under the Programmatic Agreement. A new Programmatic agreement will need to be executed to continue coordination.<br><br>Constitution to coordinate with FERC and SHPOs in 2026 to reinstate or update the Programmatic Agreement. |
| State Forest Properties (Melondy Hill and Clapper Hollow) | Easements | Constitution will evaluate status of easements and obtain as applicable. |

# ATTACHMENT E

# Declaration of Mary Colleen McKinney

# IN THE UNITED STATES
# COURT OF APPEALS FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| Stop the Pipeline, | ) | |
| *Petitioner* | ) | **26-1437** |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | **DECLARATION OF** |
| *Respondent* | ) | **MARY COLLEEN** |
| | ) | **MCKINNEY** |
| Constitution Pipeline Co., LLC; and | ) | |
| Iroquois Gas Transmission System, L.P., | ) | |
| | ) | |
| *Movants-Intervenors* | ) | |
| | ) | |
| | ) | |

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF DELAWARE | ) |

1.      I, Mary Colleen McKinney, live at 476 Poplar Hill Road #1, Unadilla, New York, 13849 (parcel number 117.-1-56.1) with my husband, Thomas Gorman. We bought this land in 2006 and renovated the circa 1865 house on it ourselves.

2.      The proposed pipeline would run approximately 1600 feet along the eastern edge of our property, but on our neighbors' land.

3.      We became members of Stop the Pipeline ("STP") about fourteen years ago to protect our home, land, and the surrounding area from the environmental

1

degradation of a 30-inch diameter interstate gas pipeline. If built, it would run from Susquehanna County, Pennsylvania through Broome, Chenango, Delaware, and Schoharie Counties in New York State.

4.     STP is a grassroots organization of people who live, work, recreate, and own property in the Northwestern Catskills, Central New York State, and North Central Pennsylvania. Its mission is to preserve and enhance the rural heritage and pristine environment in the region by ensuring the purity of its air, water, and soil, the health of its inhabitants, the resilience of its ecosystems, and the capacity of the area to be self-sustaining. The core membership of Stop the Pipeline is composed of people whose land would be affected by the project.

5.     I worked with STP to help people submit comments to the regulatory agencies in 2014 and 2015. I also developed postcards with my husband and other residents to communicate the impact the pipeline was having on directly affected landowners. It was my understanding when the United States Court of Appeals for the Second Circuit ("Second Circuit") vacated all of the orders that were under review in late 2021, that the project had been stopped. Landowners and their neighbors celebrated and started rebuilding their lives, knowing their land was theirs again. Some people made new plans for how to use it, while others were able to just enjoy the comfort of their home and land for the first time in ten years. They had been under siege from the pipeline company and now that threat was gone.

2

6.     It was a shock for Stop the Pipeline and all of its members when the Constitution Pipeline Company, LLC ("Company") filed a petition on December 19, 2025, asking the Federal Energy Regulatory Commission ("FERC") to reissue the vacated certificate of public convenience and necessity and reaffirm the order it issued in 2019 (also vacated) declaring that the New York State Department of Environmental Conservation ("DEC") had waived its rights to deny the 401 water quality certification.

7.     When Stop the Pipeline asked FERC to dismiss the proceedings on January 14, 2026, we expected the Commission to also dismiss the Company's 2025 Petition. We don't understand how a federal agency can contradict a court order.

8.     I am familiar with the operational requirements of Stop the Pipeline. Since the beginning of the year, STP has had to raise money to help its members counter what we all consider to be illegal proceedings. Six hundred dollars was needed just to file our petition with the Second Circuit.

9.     Many of us are volunteering our time and my unpaid work with STP is a financial strain. I have spent countless hours talking and writing to my neighbors about what is happening. I have helped them submit comments, attended and organized dozens of in-person and virtual meetings, and done extensive outreach to a wider community. All of these activities take a tremendous amount of time,

3

which means I have not been able to work as much as I was before the 2025 Petition was filed. Therefore my earnings have decreased.

10.    Since many landowners and elected officials are new, they have no idea where the pipeline would be located or what was expected of them. The Company provided a condensed map of the entire 124-mile route to the general public. The scale was so large you could not see what towns it would go through. The construction drawings that were attached to its 2025 Petition suffered from the opposite problem. They were so detailed you could not tell where in the real world the construction would be taking place. No large format maps were printed for review in the public libraries, like they were in 2013, when the original application was filed.

I declare under penalty of perjury that the foregoing is true and correct.

20th day of July 2026

Mary Colleen McKinney
476 Poplar Hill Road #1
Unadilla, New York, 13849

4

# ATTACHMENT F

# Declaration of Stephen Fissel and Tania Konwinski

# IN THE UNITED STATES
# COURT OF APPEALS FOR THE SECOND CIRCUIT

|  |  |  |  |
|---|---|---|---|
| Stop the Pipeline, | ) | | |
| *Petitioner* | ) | **26-1437** | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| Federal Energy Regulatory Commission, | ) | | |
| | ) | **DECLARATION OF** | |
| *Respondent* | ) | **STEPHEN FISSEL AND** | |
| | ) | **TANIA KONWINSKI** | |
| Constitution Pipeline Co., LLC; and | ) | | |
| Iroquois Gas Transmission System, L.P., | ) | | |
| | ) | | |
| *Movants-Intervenors* | ) | | |
| | ) | | |
| | ) | | |
| _____ | ) | | |

STATE OF NEW YORK )

) ss.:

COUNTY OF SCHOHARIE )

1. We, Stephen Fissel and Tania Konwinski, have been living at 456 Karker Road, Warnerville, New York, since May 2023, which is when Stephen purchased the house and 82 acres of land.

2. The real estate agents and members of the community assured us the pipeline project had been abandoned before Stephen bought the land. We also investigated the situation on our own and learned about the 2021 court order vacating FERC's orders. We were later shown a document that the Constitution

1

Pipeline Company, LLC ("Company") filed with the Schoharie County Clerk about its easements. In it, the Company unequivocally stated, "the Project will not be built." (Ex 1)

3.      We became members of Stop the Pipeline ("STP") earlier this year in order to protect our home, land, and the surrounding area from the environmental degradation of a 30-inch diameter interstate gas pipeline. If built, it would run from Susquehanna County, Pennsylvania through Broome, Chenango, Delaware, and Schoharie Counties in New York State.

4.      STP is a grassroots organization of people who live, work, recreate, and own property in the Northwestern Catskills, Central New York State, and North Central Pennsylvania. Its mission is to preserve and enhance the rural heritage and pristine environment in the region by ensuring the purity of its air, water, and soil, the health of its inhabitants, the resilience of its ecosystems, and the capacity of the area to be self-sustaining.

5.      STP's mission aligns with our goals. We searched for a large piece of land that could be rehabilitated in order to become productive. Our goal was to create a sustainable farm for personal and commercial use. Once we located this parcel on Karker Road in Warnerville, we spent all of our free time developing plans for our farm. We would not have bought this property, and invested so much time, energy, and money on restoring it if we thought the pipeline project could be revived.

6.      In 2023, we did extensive research and then sketched plans that placed the future uses of the land in areas that best matched what they needed, such as topography, hydrology, soil type, angle of sunshine, etc. We have attached sketches from September 28, 2024, April 28, 2025, and October 22, 2025 in Ex. 2, pages 1-2. A tax map of the property overlaid with a topographic map is page 3.

7.      Our first task was to remove invasive species, mostly multifloral rose and buckthorn. On August 30, 2024, Stephen bought a tractor with a brush hog from Eklund Family Farm Machinery in Stamford, NY for approximately $65,000. He started clearing the invasive species in 2024 and continued in 2025. A before and after shot at the ridgeline is on page 4 of Ex. 2.

8.      There is a wet area to the east of the house that gently flows north. Our water management plan has this collecting in a pond, as shown on page 5 of Ex. 2. The red lines indicate buried tiles, which shift to the southeast after the pond, helping to direct the water towards Panther Creek. Northeast of the pond is where we planned to place our greenhouse, which is depicted as two parallel blue bars.

9.      We located a supplier for a Geothermal 4-Season Greenhouse in Nebraska and planned on visiting them this summer. The website for Greenhouse in the Snow is https://www.greenhouseinthesnow.com/

10.     Our plans drastically changed in January 2026, after the Company filed its petition and FERC issued its Remand Order, which stated that it would consider

the petition to reissue the certificate even though its prior orders had been vacated by the Second Circuit and FERC dismissed the prior proceedings.

11.     The proposed pipeline has been superimposed over our sustainable agricultural plan on page 6 of Ex 2. It would pass through the flattest and best land. Most of the rest of the 82-acre parcel is too steep and / or too wet for farming. The pipeline would also destroy the Geothermal 4-Season Greenhouse, which is supposed to be downhill of the water management location, as depicted on page 7 of Ex 2. Since the greenhouse cannot be moved once it is installed, our plans to purchase the geothermal greenhouse were stopped by FERC's consideration of Constitution's Petition to revive the project.

12.     Instead of planning a trip to Nebraska to visit Greenhouse in the Snow, or planting more native trees, Tania spends her days learning about the project and helping to educate others about its impacts.

13.     Stephen has been forced to reconsider what he can or should do under these new circumstances and wonders if he should still invest in their sustainable farm.

14.     Both of us feel like we're at a tremendous disadvantage compared to the people who went through this the first time. There are no meetings with the pipeline company and no paper copies of the thousands (or tens of thousands) of pages of documents in the library.

15. The whole situation feels completely unfair to us. We were assured the pipeline could not be built again. Even the pipeline company said they did not intend to build it. When we bought the property, the Company no longer existed.

16. Just the threat of its revival has put a stop to many of our plans and investments. Instead, we are forced to learn about and try to participate in an obscure regulatory process that seems stacked against landowners.

We declare under penalty of perjury that the foregoing is true and correct.

_18_ day of July 2026

_____
Stephen Fissel

_____
Tania Konwinski

Stephen Fissel
Tania Konwinski
456 Karker Road
Warnerville, NY 12187

# EXHIBIT 1

Recorded Assignment of Easements

## ASSIGNMENT AND ASSUMPTION OF EASEMENTS AGREEMENT

This ASSIGNMENT AND ASSUMPTION OF EASEMENTS AGREEMENT (this "*Assignment Agreement*") is made and entered into as of the 29ᵗʰ day of June, 2022, by and between CONSTITUTION PIPELINE COMPANY, LLC, a Delaware limited liability company, with offices located at 2800 Post Oak Boulevard, Houston, TX 77056 ("*Assignor*") and WILLIAMS PIPELINE SERVICES, LLC, a Delaware limited liability company, with offices located at 2800 Post Oak Boulevard, Houston, TX 77056 ("*Assignee*").

### WITNESSETH THAT:

WHEREAS, Assignor has agreed to assign, and Assignee has agreed to accept the assignments and assume Assignor's easements for the Constitution Pipeline Project (the "*Project*");

WHEREAS, Assignor is the owner and holder of the easements for the Project which are incorporated herein by reference, which are the agreements listed on Exhibit A recorded in the land records of Schoharie County, New York (the "*Easements*").

WHEREAS, Assignor proposed to the Federal Energy Regulatory Commission ("FERC") to use the Easements for certain above ground and underground facilities (the "*Constitution Facilities*") which were approved by the FERC by Order Issuing Certificates dated December 2, 2014, at *In Re Constitution Pipeline Company, LLC*, Docket Nos. CP13-499-000 and CP13-502-000, 149 FERC ¶ 61,199 (the "*Certificate Order*").

WHEREAS, on February 24, 2020, the operator of the Project, The Williams Companies, Inc. disclosed in public filings with the United States Securities and Exchange Commission that "[a]lthough Constitution received a certificate of public convenience and necessity from the FERC to construct and operate the proposed pipeline and obtained, among other approvals, a waiver of the water quality certification under Section 401 of the Clean Water Act for the New York portion of the project, the members of Constitution, following extensive evaluation and discussion, recently determined that the underlying risk-adjusted return for this greenfield pipeline project has diminished in such a way that further development is no longer supported."

WHEREAS, despite its continued belief in the Project's mission, which was to transport inexpensive and clean burning natural gas from Pennsylvania to New York and New England, the members of Constitution ultimately determined that further financial support of the Project's development was not the best use of either Constitution's financial or human resources.

WHEREAS, Constitution no longer needs possession of the Rights of Way for survey or construction, because the Project will not be built. The Certificate Order has now expired.

WHEREAS, none of the Constitution Facilities in the Easements are constructed.

BOOK **1168** PAGE **198**

# EXHIBIT 2

Sustainable Agriculture Plans

# SKETCH PLANS



September 28, 2024



April 28, 2025

## SKETCH PLAN



October 22, 2025

## A tax map of the property with a topographic map layered on top



The farmland is located on the flattest portion of the parcel.

# Invasive Species Removal at Ridgeline



Before



After

# Water Management Plan



The blue bars depict the Geothermal 4-Season Greenhouse
The red lines are buried tiles.
The water flows into the headwaters of Panther Creek

## Pipeline Superimposed Over Sustainable Agricultural Plan



The pipeline would be located on the flattest and best agricultural land.

## The Pipeline Would Destroy the Greenhouse



Since the pipeline would destroy the greenhouse, our plans to purchase the kit have been stopped by FERC's continued consideration of Constitution's Petition.